**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **JOSHUA EDWARDS,** *et al* | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.   2:15-CV-00299** |
| | § | **JURY DEMANDED** |
| | § | |
| **4JLJ, LLC d/b/a J4 OILFIELD** | § | |
| **SERVICES,** *et al* | § | |
| | § | |
| **Defendants** | § | |

**PLAINTIFFS' BRIEF  IN SUPPORT OF**
**<u>PLAINTIFFS' FIRST AMENDED MOTION FOR SUMMARY JUDGMENT</u>**

NOW COMES Plaintiff Joshua Edwards, *et al* (hereinafter "Plaintiffs") and files this their

Brief in Support of Plaintiffs' First Amended Motion for Summary Judgment and respectfully state

as follows:

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ISSUES TO BE DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    BACKGROUND AND STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Defendants are subject to the FLSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Defendants' Fleet and Use of Vehicles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        C.      Defendants' Illegal Pay Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     ARGUMENT AND AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Elements of an FLSA Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.      John Jalufka is a joint employer as a matter of law. . . . . . . . . . . . . . . . . . . . 11

        D.      Defendants failed to properly maintain records of hours worked. . . . . . . . . . . 12

        E.      Defendant failed to properly pay overtime wages... . . . . . . . . . . . . . . . . . . . . 13

                1.      Defendants did not pay wages based on actual hours worked.. . . . . . . . . 13

                2.      Per diem payments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                3.      Non-Discretionary bonuses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                4.      Show up time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        F.      Defendants have the burden of proof with regards to its exemption defense... . . 17

        G.      The MCA Exemption.... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        H.      Computer Related Exemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        I.      Plaintiffs are entitled to liquidated damages. . . . . . . . . . . . . . . . . . . . . . . . . . 24

        J.      Plaintiffs are entitled to a three year statute of limitations.. . . . . . . . . . . . . . . 25

V.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**CASE LAW**

*Aikins v. Warrior Energy Servs. Corp.,*
  2015 U.S. Dist. LEXIS 32870 (S.D. Tex. Mar. 17, 2015)........................ 19

*Allen v. Coil Tubing Servs., L.L.C.,*
  846 F. Supp. 2d 678, 704 (S.D. Tex. 2012). .................................... 19

*Anderson v. Mt. Clemens Pottery Co.,*
  328 U.S. 680, 687 (1946) .................................................... 11

*Barcellona v. Tiffany English Pub, Inc.,*
  597 F.2d 464, 468 (5th Cir.1979) (emphasis in original). ...................... 24

*Barrentine v. Ark.-Best Freight Sys., Inc.,*
  450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981). ..................... 17

*Bartels v. Birmingham,*
  332 U.S. 126, 67 S. Ct. 1547, 91 L. Ed. 1947 (1947). ........................... 11

*Bay Ridge Operating Co. v. Aaron,*
  334 U.S. 446, 461 (1948)..................................................... 13

*Bernard v. IBP, Inc. of Neb.,*
  154 F.3d 259, 267 (5th Cir. 1998). ........................................... 24

*Botero v. Commonwealth Limousine Serv.,*
  12-cv-10428, 2013 U.S. Dist. LEXIS 104947, *36 (D. Mass. Apr. 12, 2013). ........ 20

*Chicca v. St. Luke's Episcopal Health Sys.,*
  858 F. Supp. 2d 777, 784 (S.D. Tex. 2012)..................................... 23

*Cleveland v. City of Elmendorf,*
  388 F.3d 522, 526 (5th Cir. 2004). ........................................... 18

*Donovan v. Janitorial Services, Inc.,*
  672 F.2d 528 (5th Cir.1982). ................................................. 12

*Donovan v. I-20 Motels, Inc.,*
  664 F.2d 957 (5th Cir.1981)................................................... 12

*Donovan v. Sabine Irrigation Co.*,
   695 F.2d 190  (5th Cir. La. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Falk v. Brennan*,
   414 U.S. 190 (1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Faniola v. Proteus Servs., LLC*,
   2015 U.S. Dist. LEXIS 138963, at *6-7 25 (S.D. Tex. Oct. 13, 2015). . . . . . . . . . . . . 19

*Heidtman v. County of El Paso*,
   171 F.3d 1038, 1042 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hernandez v. Alpine Logistics*, LLC,
   08-cv-6254, 2011 U.S. Dist. LEXIS 96708, *14,
    *17-18 (W.D.N.Y. Aug. 29, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hodgson v. Griffin and Brand of McAllen, Inc.*,
   471 F.2d 235 (5th Cir.), cert. denied, 414 U.S. 819 (1973).. . . . . . . . . . . . . . . . . . . . . 11

*Martin v. Ind. Mich. Power Co.*,
   381 F.3d 574, 580 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mayan v. Rydbom Express, Inc.*,
   07-cv-2658, 2009 U.S. Dist. LEXIS 90525,
   *12-13 (E.D. Pa. Sept. 30, 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McCloud v. McClinton Energy Group, L.L.C.*,
   2015 U.S. Dist. LEXIS 20374 (W.D. Tex. Feb. 20, 2015). . . . . . . . . . . . . . . . . . . . . 16

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128, 133, (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*McMaster v. E. Armored Servs., Inc.*,
    2013 WL 1288613, *4 (D.N.J. March 26, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mednick v. Albert Enterprises, Inc.*,
   508 F.2d 297 (5th Cir.1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Meza v. Intelligent Mexican Marketing, Inc.*,
   720 F.3d 577, 581 (5th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mireles v. Frio Foods, Inc.*,
   899 F.2d 1407, 1415 (5th Cir.1990) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*O'Brien v. Lifestyle Transp., Inc.*,
    956 F. Supp. 2d 300, 305 (D. Mass. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Picton v. Excel Group, Inc.*,
    192 F. Supp. 2d 706 (E.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Real v. Driscoll Strawberry Associates, Inc.*,
    603 F.2d 748 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Roche v. S-3 Pump Service, Inc.*,
    2016 U.S. Dist. LEXIS 82 (W.D. Tex. Jan. 4, 2016). . . . . . . . . . . . . . . . . . . . 2,12,19,21

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Singer v. City of Waco, Tex.*,
    324 F.3d 813, 821 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Solis v. Hooglands Nursery, L.L.C.*,
    372 Fed. Appx. 528, 530 (5th Cir. La. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Torres v. Gristede's Operating Corp.*,
    2011 U.S. Dist. LEXIS 114209 (S.D.N.Y. Sept. 9, 2011). . . . . . . . . . . . . . . . . . . . . . 12

*Tyler v. Union Oil Co. of Cal.,*
    304 F.3d 379, 402 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vanzzini v. Action Meat Distribs.*,
    11-cv-4173, 2014 U.S. Dist. LEXIS 13781, *20 (S.D. Tex. Jan. 31, 2014). . . . . . . . . . 20

*Walling v. Helmerich & Payne, Inc.*,
    323 U.S. 37 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Weber v. Roadway Exp., Inc.*,
    199 F.3d 270, 272 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wirtz v. Lone Star Steel Co.*,
    405 F.2d 668 (5th Cir.1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Yu G. Ke v Saigon Grill, Inc*.
    595 F. Supp. 2d 240 (2008, SD NY) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATUTES

29 U.S.C. § 202(a).................................................................. 17

29 U.S.C. § 206(a).................................................................. 11

29 U.S.C. 207....................................................................... 18, 24

29 U.S.C. § 207(a).................................................................. 17

29 U.S.C. § 207(a)(1)............................................................. 11, 13

29 U.S.C. § 207(e).................................................................. 13

29 U.S.C. § 213(b)(1)............................................................. 17, 18

29 U.S.C. § 216(b).................................................................. 24

29 U.S.C. § 255(a).................................................................. 25

29 U.S.C. § 260..................................................................... 21

49 U.S.C. § 31502.................................................................. 24

## OTHER AUTHORITIES

29 C.F.R. § 516..................................................................... 13

29 C.F.R. § 541.400(b)............................................................ 23

29 C.F.R. § 578.3................................................................... 25

29 C.F.R. § 578.3(c)(1)............................................................ 25

29 C.F.R. § 778.200(a)(3)......................................................... 16

29 C.F.R. § 778.208................................................................ 16

29 C.F.R. § 778.211................................................................ 16

29 C.F.R. § 778.216(a)............................................................. 15

29 C.F.R. § 778.216(b)(3)......................................................... 15

29 C.F.R. § 778.216 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 C.F.R. § 778.220. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

29 C.F.R. § 778.312. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

29 C.F.R. § 778.312(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 C.F.R. § 778.312(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 C.F.R. § 778.312(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 C.F.R. § 782.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

29 C.F.R. § 785.22(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 CFR 785.50 (b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

29 C.F.R § 790.15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

29 C.F.R § 790.22(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

49 C.F.R. § 390.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

49 C.F.R. § 390.19(h)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

49 C.F.R. § 390.21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users
    Pub. L. No. 109-59, § 4142(a), 119 Stat. 114, 1747 ("SAFETEA-LU") . . . . . . . . . . . . 10

SAFETEA-LU Technical Corrections act of 2008, Pub. L. No. 110-244,
    122 Stat. 1572, 1620 ("TCA"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15, 16

# I. <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs filed their original Motion for Summary Judgment on March 8, 2016. This First Amended Motion for Summary Judgment takes the place of said Motion. The Court granted leave for Plaintiffs to file this First Amended Motion for Summary Judgment on May 10, 2016. In case there is any confusion on Defendants' part, this is a Motion for Partial Summary Judgment on the issues listed below.

Plaintiff Edwards filed this collective action to recover unpaid wages and overtime wages owed to him individually and on behalf of all other current and former employees of Defendants employed as frac and pumping employees who were paid based on jobs performed rather than actual hours worked, from July 13, 2012 to the present. Forty-one former employees have opted in.

Defendants freely admit that they did not pay Plaintiffs based on actual time worked, but rather paid based on jobs performed.[1] In addition to not paying based on actual hours worked, Defendants provided a per diem payment of $40 per day and non-discretionary bonus payments, which were not included in the calculation of "overtime" paid by Defendants.

Plaintiffs allege, and Defendants admit that Plaintiffs regularly worked in excess of 40 hours per week.

Since Plaintiffs were not paid a salary, and therefore cannot meet the salary basis test required by most exemptions, Defendants are attempting to rely upon the Motor Carrier Act ("MCA") exemption. However, the undisputed factual record establishes that Plaintiffs fall outside

---

[1] Note that Defendant 4JLJ, LLC admits that it paid on a task basis in its Original Answer, and in verified responses to Interrogatories. During his deposition, John Jalufka stated that his verified response to Interrogatories was nothing more than "legal mumbo jumbo" and "double talk" and that such responses were just incorrectly answered by his previous attorneys. **Ex. "A" pg. 47, App. pg. 14** Despite defense counsels' attempts to coach their clients into denying a task based system of pay, Defendants proudly admitted such a pay scheme during their depositions. See references below.

of the scope of the narrowly-construed MCA exemption to the Fair Labor Standards Act's ("FLSA") overtime pay mandate under the SAFETEA-LU Technical Corrections act of 2008, Pub. L. No. 110-244 ("TCA"). Because Plaintiffs worked, drove, and maintained vehicles with gross vehicle weight ratings ("GVWR") of 10,000 pounds or less they are "covered employees" under the TCA's exception to the MCA and are entitled to overtime protection under to the FLSA.[2]

Although not pled, Defendants have also suggested that Plaintiff Joshua Edwards is subject to the computer technician exemption. However, Plaintiff Joshua Edwards' stated hourly rate was $16.50, much less than the $27.63 per hour required by such exemption.

Defendants bear the burden of proving the applicability of their claimed exemptions. Defendants have not and cannot produce any evidence to show a genuine issue of material fact for trial on such exemptions. Plaintiffs are entitled to judgment in their favor as a matter of law.

## II. **ISSUES TO BE DECIDED**

1.  Whether Defendant John Jalufka is a statutory employer of Plaintiffs, and therefore jointly and severally liable for overtime wages, liquidated damages, and attorney fees owed to Plaintiffs.

2.  Whether the Defendants kept proper records of actual hours worked as required by the FLSA.

3.  Whether the Defendants paid the Plaintiffs in violation of the FLSA.

4.  Whether Plaintiffs were non-exempt employees entitled to overtime pay under the FLSA and its associated regulations.

---

[2] GVWR is the *maximum* operating weight of a vehicle as specified by the manufacturer including the vehicle's chassis, body, engine, engine fluids, fuel, accessories, driver, passengers and cargo. In other words, it is the maximum that the vehicle may way and still be safely driven per the manufacturer's specifications. The circuit courts are split with regards to whether actual weight or GVWR should be used. In a recent decision from the Western District of Texas, the court discussed which weight should be used and chose to use GVWR due to the fact that actual weight is variable and would be difficult to track on a daily basis. *Roche v. S-3 Pump Service, Inc.*, 2016 U.S. Dist. LEXIS 82 (W.D. Tex. Jan. 4, 2016). Accordingly, Plaintiffs have chosen to use GVWR for purposes of their motion for summary judgment.

5.     Whether Plaintiffs are entitled to liquidated damages.

6.     Whether Plaintiffs are entitled to a three year statute of limitations.

### III. BACKGROUND AND STATEMENT OF FACTS

**A.     Defendants are subject to the FLSA.**

Defendant 4JLJ, LLC is a company that provides well stimulation services to well owners. At all relevant times, Defendant 4JLJ, LLC engaged in interstate commerce. **Defendant's Org. Ans. Dkt. #34 ¶ 10.**[3] Defendant 4JLJ, LLC's sales are in excess of $500,000.00 per year. **Id.** At all relevant times Defendant 4JLJ, LLC has been subject to the minimum wage and overtime provisions of the FLSA. **Id.**

Defendant John Jalufka is the President, sole member, and sole owner of 4JLJ, LLC. **[Ex. "A" pgs. 7-9 App. pg. 4]** As President, sole member, and sole owner of 4JLJ, LLC, Mr. Jalufka has the authority to control every aspect of the company. [**Ex. "A" pgs. 79-80 App. pg. 22, and Ex. "B" App. pgs. 31-61**]

**B.     Defendants' Fleet and Use of Vehicles**

Defendants' fleet of vehicles include 20 vehicles with a GVWR of 10,000 pounds or less ("Support Vehicles"), and a number of vehicles with a GVWR greater than 10,000 pounds. **[Ex. "C" App. pgs. 63-90]**[4]

Whenever Defendants performed a well stimulation job, the needed vehicles would travel to the job by convoy. **[Ex. "A" pgs. 25-26, 32-33 App. pgs. 8-10, Ex. "D" App. pgs. 92-133, Ex.**

---

[3] Note that Defendant 4JLJ, LLC filed a motion for leave to amend its Answer, and although leave was granted, an amended Answer has never been filed by Defendant 4JLJ.

[4] Note that portions of Exhibit "A" have been produced in two separate lawsuits, with the version bates numbered 4JLJ 0001752 - 1755 being much more legible than the version produced in this case. Accordingly, Plaintiffs have included both versions in Exhibit "C" for clarity.

**"E" pgs. 14-19 App. pgs. 139-140]** A job convoy would in reality consist of two convoys. The first convoy would be the transportation of 4-5 Sand Kings, which were oversized vehicles used for hauling and storing sand. **Id.** The second convoy often consisted of 10-12 pump trucks, a blender, a chemical transport truck, an LSA unit (basically a 52' trailer used for transporting chemicals), a manifold unit (a 40' trailer with a piping manifold on it), a boom truck, a T-Belt (basically a conveyor on a trailer) a data van, and a hydration unit. **Id.**

The second convoy would also consist of a number of smaller Support Vehicles, such as Ford Econoline vans (used for transporting crew and tools), Dodge 1500 pick-up trucks, Dodge 2500 pick-up trucks, Dodge 3500 pick-up trucks, Ford F150, Ford F250, Ford F350, and a Ford Expedition. **[Ex. "C" App. pgs. 63-90, Ex. "D"App. pgs. 92-133]** There were often many more crew members than large trucks, and therefore not all of the crew members would drive in the convoy. **Id.** The Ford Econoline vans were used extensively in every convoy. **Id.**

Once all of the vehicles arrived at the well site, the pump trucks, blender, chemical transport, LSA unit, manifold, boom truck, T-belt, data van and hydration units would be rigged up. **Id.** Rigging up entailed significant amounts of manual labor, and consisted of hooking all of the interconnecting pipes, and power and data cables between the various vehicles and equipment. **Id.** Once rigged up, the large vehicles would remain connected to the various other equipment and stay onsite until the end of the job. **Id.** Essentially, the large vehicles, with a GVWR in excess of 10,000 pounds, were only driven twice for each job. **Id.** They were driven once **to** the location, and then once **from** the location. **Id.** Frac and pump jobs typically lasted a day or two, and longer jobs could take as long as a week, with some rare jobs taking several weeks. **[Ex. "A" pgs. 32-33 App. pg. 10]**. Throughout the various jobs, the heavier vehicles would remain rigged up until the job was

complete, and the employees would use the smaller vehicles (primarily the vans) for transportation to and from the well site, and to perform various job tasks. **[Ex. "D" App. pgs. 92-133, Ex. "V" pgs. 84, 100, 103-105 App. pgs. 557, 561-562].** Accordingly, the vast majority of the Plaintiffs' time was spent working as pump or frac hands and operating Support Vehicles, and not as drivers driving vehicles with a GVWR in excess of 10,000 pounds. **Id.**

Upon arrival at the frac site, any pick-up truck that was pulling a trailer was detached from the trailer, and such vehicle would remain detached from the trailer until the end of the frac job. **[Ex. "D" App. pgs. 92-133]**

The smaller Support Vehicles, including the pick-up trucks (without trailers attached), Ford Expedition and the crew vans, were used daily throughout each job (without trailers attached), and were essential to performing the services provided by Defendants. **[Ex. "D" App. pgs. 92-133]** The Support Vehicles were used daily to purchase supplies, make hot-shot deliveries, transport supplies, tools and crew members to and from the job site. **Id.** Such trips, which usually occurred in the vans, included trips back to the yard to retrieve equipment and trips back and forth from the man camps or hotels to the well site. **Id.** According to John Jalufka and Rebekkah Clark, all travel time to and from the well site, whether it was from a hotel, or to and from the yard or man camp, was considered compensable time by 4JLJ, LLC. **[Ex. "A" pgs. 33-36 App. pgs. 10-11, Ex. "F" 15-16, 37-38 App. pgs. 177, 182-183]** As Travis Irelan testified:

> A:   You got paid when you got in the van to leave for work until you got out of the van when you were back on site back at the man camp.
>
> Q:   Okay. And is that the same thing that - - in your experience, that happened at J4?
>
> A:   Yes.

**[Ex. "E" pg. 37 App. pg. 144].** Mr. Irelan also explained that there have been times when

employees have failed to correctly include their travel time to the man camp as compensable time, and he corrected the situation by instructing the employee to include such time. **[Ex. "E" pg. 65, App. pg. 151. See also Ex. "J" App. pg. 227]** It should also be noted that the man camp was located within the Odessa yard, which included a shop and other facilities operated and/or owned by Defendants. **Id pg. 22 App. pgs. 141.** Work was often performed at the yard/man camp before and after returning from a well site, in preparation for the next day's labors. **[Ex. "G" pgs. 9-12 App. pgs. 191-192]**

Often, when traveling back and forth to the man camp and/or hotel, the vans were loaded with not only crew members, but also equipment. **[Ex. "D" App. pgs. 92-133, Ex. "S" pgs. 41-43 App. pgs. 441-442]** Such trips occasionally required the Plaintiffs to cross state lines and to drive on interstate highways. **Id.** Further, the Plaintiffs were responsible for ensuring that the Support Vehicles were properly maintained, safely loaded, and safely operated. **Id.**

All Plaintiffs regularly drove and were expected to drive vehicles with a GVWR of less than 10,000 pounds as part of their job duties (including Andreas Villarreal, who didn't even have a driver's license at the time that he worked for Defendants, and yet was assigned to drive a vehicle with a GVWR of less than 10,000 pounds). **[Ex. "D" App. pgs. 92-133]** Plaintiffs drove such vehicles without a trailer attached on at least a weekly basis and often on a daily basis. **Id.** All Plaintiffs drove the Support Vehicles *far more frequently* than they drove vehicles with a GVWR of more than 10,000 pounds. **Id.** Representative Plaintiffs Humberto Morales and Francisco Gutierrez were assigned the Ford Expedition, and drove it daily in the furtherance of their job duties. **[Ex. "D" App. pgs. 130-133, Ex. "T" pgs. 94-96 App. pg. 474].**

In sum, as set forth above, throughout Plaintiffs' entire employment with Defendants and as

part of Plaintiffs' required job duties, Plaintiffs worked with, worked on, drove, loaded or performed mechanic and maintenance duties on vehicles with a GVWR of less than 10,000 pounds on at least a weekly basis, and often on a daily basis. **[Ex. "D" App. pgs. 92-133]** Plaintiffs worked with, worked on, drove or loaded the above described Support Vehicles during every week of Plaintiffs' scheduled shifts in interstate or foreign commerce carrying Defendants' property on public highways and as part of Plaintiffs' required job duties. **Id.** The Support Vehicles were driven as a part of every convoy, and such convoys typically occurred on at least a weekly basis. **[Ex. "A" pgs 32-33, App. pg. 10]** Plaintiffs had a reasonable expectation that they would drive, load and work with Defendants' Support Vehicles on a weekly basis and that they would cross state lines in doing so. **[Ex. "D" App. pgs. 92-133]**

Finally, it is anticipated that Defendants will claim that some of the Support Vehicles are used to transport hazardous materials in amounts that require placarding per federal law. Defendants possess three goose neck trailers that Defendants claim to occasionally transport hazardous materials with. **[Ex. "H" pgs. 37-39 App. pgs. 212-213]** The trailers themselves are not actually placarded for the transportation of hazardous materials, but there are several wooden stanchions with hazardous materials placards on them that can be moved from trailer to trailer. **Id.** Defendants contend that all vehicles within its fleet of vehicles that could possibly pull the trailers in question, are therefore kept in a state of readiness to transport hazardous materials, despite the fact that to do so would be illegal since none of the Support Vehicles have DOT numbers displayed on them. **[Ex. "I" App. pgs. 221-225]**

### C. Defendants' Illegal Pay Scheme

Defendants' employees were loosely divided between the "pump" side and the "frac" side.

Employees often switched between the pump side and the frac side, depending on where the employees were needed. **[Ex. "E" pg. 93 App. pg. 158]** With regards to the pump side, employees received credit for whatever hours a job was billed to Defendants' client. **[Ex. "A" pgs. 49-50, 90-92 App. pgs. 14-15 , Ex. "G" 35-37 App. pgs. 198, Ex. "F" 12-15 App. pgs. 176-177, Ex "D" App. pgs. 92-133]** For instance, if the client was billed 16 hours for a particular pump job, then the employee would be credited with 16 hours of work for that job, even if the employee only actually worked 4 hours. **Id.** If the employee happened to work on two 16 hour pump jobs in one day, the employee would be credited 32 hours for a single day's work, even though the employee may have only worked 10 hours for the day.[5] **Id.** In other words, Plaintiffs' pay was not based on actual hours worked, but rather on jobs performed. **[Ex. "V" pgs. 61-68, 126-128 App. pgs. 551-553, 568]**

With regards to the frac side, Plaintiffs were initially paid on a per stage basis (18 hours for one stage, 24 hours for two stages), with no regard to actual hours worked. **[Ex. "S" pgs. 99, 102-109, 112-113, 116-117 App. pgs. 456 - 460]** The number of credited hours for a stage was eventually decreased to 16, then 14, and then eventually Defendants' managers would just dictate to the Plaintiffs a number of hours they should put on their time sheets, with Defendants occasionally giving the employees extra hours exceeding actual hours worked, as a reward for working hard. **[Ex. "G" pgs. 21-23, 32-33, 35-37 App. pgs. 194-195, 197, 198, Ex. "S" pgs. 99, 102-109, 112-113, 116-117 App. pgs. 456 - 460]** Such crediting of extra hours was discretionary, and no records of when such additional hours were credited to the employees were maintained. **Id**. In short, Defendants

---

[5]By paying for hours not actually worked, the regular rate of pay and overtime rate would be greatly increased. In our example, an employee earning $20 per hour, who is paid 32 hours for 10 hours of actual work would have a regular rate of pay of $64 per hour, and his true overtime rate would be $96 per hour ($20 x 32 "credited" hours = $640) (640/10 actual hours=$64) ($64 x 1.5 = $96). The "overtime" rate that Defendants actually paid to such employee was $30 per hour ($20 x 1.5=$30), a difference of $66 per overtime hour worked.

did not pay based on actual hours worked, and did not reference any records regarding actual hours worked when calculating Plaintiffs' regular hourly rate or "overtime" pay. **Id**. See also **Ex. "T" pgs. 15-18, App. pgs. 472-473, Ex. "J" pgs. 228-242, Ex. "U" pgs. 480-534.**

Although Defendants claim that employees maintained records of actual hours worked by means of the federally required daily driver's logs kept by commercial drivers, Defendants readily admit that they never referenced such records when calculating Plaintiffs' pay. **[Ex. "A" 55-57 App. pg. 15, Ex. "F" pg. 38 App. pg. 183, Ex "G" pgs. 32-33 App. pg. 197]** Furthermore, the Representative Plaintiffs have testified that they were directed by their supervisors to falsify the daily logs to reflect less hours than actually worked. **[Ex. "S" pgs. 99-101, 111-112 App. pgs. 456, 459, Ex. "V" pgs. 46-47 App. pg. 548]**

Defendants would pay "overtime" for hours *credited* in excess of 40 "hours," however, such "overtime" pay had no relation to the number of hours actually worked by the employee. **[Ex. "A" pg. 90 App. pg. 90, Ex. "F" 12-13, 15 App. pgs. 176-177, Ex. "G" 21-23, 32-33, 35-37 App. pgs. 194-195, 197, 198, Ex. "U" App. pgs. 480-534, Ex. "V" pgs. 53-54, 61-64 App. pgs. 549-552]** For instance, on one occasion, Israel Banda was credited with 44.5 hours in a single day.[6] **[Ex. "J" App. pgs. 227-242 ]** Thus, if that day happened to be the first day of the 7 day period, Mr. Banda would have received 40 hours of regular pay and 4.5 hours of "overtime" pay, for a single day's work. In addition, the "overtime" pay did not take into consideration that the employee was actually being paid far in excess of his stated hourly rate (due to the fact that the employee was being paid for hours that he did not work), or per diem and non-discretionary bonus payments received for that particular week. **Id.** See footnote 5.

---

[6] Note that being credited for more than 24 hours of work in a single 24 hour period was not an unusual event. **[Ex. "K," App. pgs. 244-255]**

Finally, since the Defendants did not reference any records of actual hours worked when calculating overtime pay, it would have been impossible for the Defendants to have properly calculated the Plaintiffs' regular rate of pay, and consequently overtime pay owed (total compensation / ? Actual hours worked = ?) (1.5 x ? = ?) (? hours worked in excess of 40 x ? overtime rate = ?).

All Plaintiffs worked hours far in excess of forty (40) hours per week. **[Ex. "D" App. pgs. 92-133]**. In fact, a number of the Plaintiffs are entitled to be paid for 24 hour shifts due to the fact that they were required to remain on the Defendants' premises for a 24 hour period, without receiving 5 hours of uninterrupted sleep. **[Ex. "D" pgs. 126-129]** See 29 C.F.R. § 785.22(b).

In addition to the foregoing, Plaintiffs received per diem payments of $40 per day. **[Ex. "F" pgs. 20-21, App. pg. 178, Ex. "Q" App. pg. 423]** Such payments were not for reimbursement of specific purchases, but were rather paid as extra compensation to the employees. **Id.** Plaintiffs also received non-discretionary bonuses. **[Ex. "B" App. pgs. 31-33]** Such bonuses and per diem payments were not taken into account when Defendants calculated Plaintiffs' "overtime pay" as required by the FLSA. **[Ex. "L" App. pgs. 257-349]**

Defendants contend that they implemented their pay scheme in an effort to retain workers. **[Ex. "A" pgs. 59-60, App. pg. 17, Ex. "G" pg. 22, App. pg. 195]** When asked why Defendants didn't just increase their hourly rate, Colton Willis explained that Defendants' pay scheme allowed Defendants to pay their employees more per hour while they were being productive, and less per hour when they were not in the field. **[Ex. "G" pg. 22, App. Pgs. 195]**

## IV. <u>ARGUMENT AND AUTHORITY</u>

### A. **Summary Judgment Standard**

"If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment is proper." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 272 (5th Cir. 2000) (citations omitted).

### B.    Elements of an FLSA Claim

The elements of an FLSA claim for overtime wages are: 1) plaintiff was employed by defendant during the relevant period; 2) plaintiff was engaged in commerce or employed by an enterprise engaged in commerce or the production of goods for commerce that had annual gross sales of at least $500,000; and 3) the defendant failed to pay plaintiff minimum wage and/or overtime pay. See id. §§ 206(a), 207(a)(1); see also *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)

In the present case, only element 3 is at issue. There is no question of fact that Plaintiffs were employed by Defendants, and that Defendants had in excess of $500,000.00 in sales annually. **Defendant's Org. Ans. Dkt. #34 ¶ 10.**

### C.    John Jalufka is a joint employer as a matter of law.

An "employer" is defined under Section 3(d) of the Act as including "any person acting directly in the interest of an employer in relation to an employee." This term has been interpreted to encompass one or more joint employers, *Falk v. Brennan*, 414 U.S. 190 (1973); *Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir.), cert. denied, 414 U.S. 819 (1973); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668 (5th Cir.1968). 29 C.F.R. § 791.2 (1982). Determination of joint employer status is not circumscribed by formalistic labels or common-law notions of the employment relationship. *Bartels v. Birmingham*, 332 U.S. 126, 67 S. Ct. 1547, 91 L. Ed. 1947 (1947); *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir.1975). Instead, the analysis must focus upon the **totality of the circumstances**, underscoring the economic realities of the plaintiffs'

employment. *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748 (1978); *Hodgson* 405 F.2d 668. See also *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947). In so doing, courts adhere to the firmly-established guidon that the FLSA must be liberally construed to effectuate Congress' remedial intent. *Donovan v. Janitorial Services, Inc.*, 672 F.2d 528 (5th Cir.1982); *Donovan v. I-20 Motels, Inc.*, 664 F.2d 957 (5th Cir.1981). See *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190 (5th Cir. La. 1983). "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Roche v. S-3 Pump Serv.*, 2016 U.S. Dist. LEXIS 82 (W.D. Tex. Jan. 4, 2016).

Defendant Jalufka is the sole owner, sole member, and president of 4JLJ, LLC. **[Ex. "A" pgs. 7-9, 79-80 App. pg. 4, 22, Ex. "B" App. pgs. 31-61**] In short, there is no aspect of 4JLJ, LLC's operations from top to bottom and side to side which is beyond Mr. Jalufka's reach. There is no area of 4JLJ, LLC which is not subject to his control, whether he chooses to exercise it or not. See *Torres v. Gristede's Operating Corp.*, 2011 U.S. Dist. LEXIS 114209 (S.D.N.Y. Sept. 9, 2011). As Rebekkah Clark, vice president of 4JLJ, LLC responded when asked if John Jalufka is the boss, "He owns the company." **[Ex. "F" pg. 8 App. pg. 175]** Memoranda effecting the operations, policy, procedure, pay, and other terms of employment are all signed or attributed to John Jalufka. **[Ex. "B" App. pgs. 31-61]** The bonus policy actually states, "This Bonus is exactly what it states. It is a Bonus awarded to employees *by John Jalufka* for Excellent Performance." **Id.** Mr. Jalufka personally terminated numerous employees. **Id, and Ex. "V" pgs. 39-40, 43, App. pgs. 546-547.** He also supervised at the well site and yard. **[Ex. "S" pg. 31, App. pgs. 439, Ex. "V" pg. 32, App. pg. 544]**Accordingly, there is no question of fact that Mr. Jalufka is a joint employer under the Act.

**D.** **Defendants failed to properly maintain records of hours worked.**

29 CFR Part 516 requires employers to maintain records of the hours worked each day. There is no question of fact that Defendants failed to maintain such records.

**E.** **Defendants failed to properly pay overtime wages.**

**1. Defendants did not pay wages based on actual hours worked.**

The FLSA requires that non-exempt employees who work more than forty hours in a work week must be paid one and one-half times their "regular rate" of pay. 29 U.S.C. § 207(a)(1). The FLSA broadly defines "regular rate" as the hourly rate actually paid the employee for "all remuneration for employment." 29 U.S.C. § 207(e); see also *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944). "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 461 (1948). The "regular rate" becomes a mathematical computation once the parties have decided on the amount of wages and the mode of payment, which is unaffected by any designation to the contrary in the wage contract. *Id*. The "regular rate" is not an arbitrary label--it is an actual fact. *Id*.

> The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of **hours actually worked** by him in that workweek for which such compensation was paid.

29 CFR 778.109 (emphasis added).

With regards to pay schemes such as Defendants', the Code states:

29 C.F.R. § 778.312 Pay for task without regard to actual hours.

> (a) **Under some employment agreements employees are paid according to a job or task rate without regard to the number of hours consumed in completing the task. Such agreements take various forms but the two most usual forms are the following**:

(1)     It is determined (sometimes on the basis of a time study) that an employee (or group) should complete a particular task in 8 hours. **Upon the completion of the task the employee is credited with 8 "hours" of work though in fact he may have worked more or less than 8 hours to complete the task. At the end of the week an employee entitled to statutory overtime compensation for work in excess of 40 hours is paid at an established hourly rate for the first 40 of the "hours" so credited and at one and one-half times such rate for the "hours" so credited in excess of 40. The number of "hours" credited to the employee bears no necessary relationship to the number of hours actually worked. It may be greater or less. "Overtime" may be payable in some cases after 20 hours of work; in others only after 50 hours or any other number of hours.**

. . .

(b)     **These employees are in actual fact compensated on a daily rate of pay basis. In plans of the first type, the established hourly rate never controls the compensation which any employee actually receives. Therefore, the established rate cannot be his regular rate.** In plans of the second type the rate is operative only for the slower employees who exceed the time allotted to complete the task; for them it operates in a manner similar to a minimum hourly guarantee for piece workers, as discussed in § 778.111. On such days as it is operative it is a genuine rate; at other times it is not.

(c)     **Since the premium rates (at one and one-half times the established hourly rate) are payable under both plans for hours worked within the basic or normal workday (if one is established) and without regard to whether the hours are or are not in excess of 8 per day or 40 per week, they cannot qualify as overtime premiums under section 7(e) (5), (6), or (7) of the Act. They must therefore be included in the regular rate _and no part of them may be credited against statutory overtime compensation due_.** Under plans of the second type, however, where the pay of an employee on a given day is actually controlled by the established hourly rate (because he fails to complete the task in the 8-hour period) and he is paid at one and one-half times the established rate for hours in excess of 8 hours actually worked, the premium rate paid on that day will qualify as an overtime premium under section 7(e)(5).

Emphasis added.

Defendants' pay scheme falls squarely within example a(1) of 29 C.F.R. § 778.312. The Plaintiffs were paid a set number of hours for certain jobs performed. Although their pay stubs indicated that they received "overtime" pay, the "overtime" pay had no relation to the actual hours worked, or their regular rate of pay, and records regarding actual hours worked were not referenced

-14-

at all by Defendants when calculating pay. Accordingly, the "overtime" paid to Plaintiffs **"must therefore be included in the regular rate and no part of them may be credited against statutory overtime compensation due."** 29 C.F.R. § 778.312(c).

Even if the Court were to determine 29 C.F.R. § 778.312 does not apply, the same result would be warranted. Because Defendants did not pay based on actual hours worked, there is no possible way that Defendants could have correctly paid overtime wages. Without referencing actual hours worked, the regular rate of pay cannot be calculated, and consequently, overtime wages cannot be calculated (total compensation / ? actual hours = ? regular rate) (? regular rate x 1.5 = ? overtime rate) (? hours in excess of 40 hours x ? overtime rate = $?). Further, since wages were not paid based on actual hours worked, it is impossible to calculate what portion of the received pay can be credited against statutory overtime compensation due, or even what the proper regular rate or overtime rate should have been. Accordingly, the same result is warranted, in that all compensation received must be included in calculating Plaintiffs' regular rate of pay, and no portion of their received pay can be credited against statutory overtime compensation due.

### 2.  Per diem payments.

Per diem payments may only be excluded from the regular rate of pay when such payments are made to closely approximate actual expenses incurred by the employee. 29 C.F.R. § 778.216(a), (b)(3), (c). Such an analysis must be based on an individual employee's circumstances, and may not be made on a group basis. *Picton v. Excel Group, Inc.*, 192 F. Supp. 2d 706 (E.D. Tex. 2002) (". . . the FLSA permits employers to approximate per diem payments in terms of *individual* employees only.") In the present case, no such individual employee analysis was performed, and all employees received the same per diem payments, regardless of whether they actually incurred any expenses. Accordingly, such payments are required to be included in determining Plaintiffs' regular rate. Id.

### 3. Non-Discretionary bonuses.

Non-discretionary bonus payments are part of an employee's regular compensation rate, which is used to calculate the rate of overtime that must be paid. *McCloud v. McClinton Energy Group, L.L.C.*, 2015 U.S. Dist. LEXIS 20374 (W.D. Tex. Feb. 20, 2015) citing 29 C.F.R. § 778.208; see also id. § 778.211 (noting that, once an employer promises in advance to pay a bonus or has set out a fixed compensation scheme, such as allocating one cent for each item sold, a bonus becomes nondiscretionary and part of the employee's regular compensation rate). Defendants paid an hourly bonus based on whether certain criteria were met. **(Ex. "B" App. pgs. 31-33 )** Such bonus was ". . . to be earned" and was paid on an hourly basis. **Id.** Accordingly, all such bonus payments should be included when calculating Plaintiffs' regular rate of pay. See 29 C.F.R. § 778.200(a)(3).

### 4. Show up time.

In an effort to avoid liability in this case, Defendants' new attorneys have attempted to characterize Defendants' pay scheme as being payment for "show up" time as described in 29 C.F.R. § 778.220, which states:

> § 778.220 "Show-up" or "reporting" pay.
>
> (a) Applicable principles. Under some employment agreements, an employee may be paid a minimum of a specified number of hours' pay at the applicable straight time or overtime rate on *infrequent* and *sporadic* occasions when, after reporting to work at his scheduled starting time on a regular work day or on another day on which he has been scheduled to work, he is not provided with the expected amount of work. The amounts that may be paid under such an agreement over and above what the employee would receive if paid at his customary rate only for the number of hours worked are paid to compensate the employee for the time wasted by him in reporting for work and to prevent undue loss of pay resulting from the employer's failure to provide expected work during regular hours. . .

Defendants' pay scheme had nothing to do with "show-up" time. Defendants always had plenty of work for Plaintiffs, regardless of the weather conditions. **[Ex. "A" pgs. 93-95 App. pgs. 25-26]** John Jalufka actually characterized the payments as a "retainer" and Colton Willis explained that the

payments were made in an effort to minimize hourly wages while employees are not being productive. **[Ex. "A" pg. 90 App. pg. 25, Ex. "G" pg. 22 App. pg. 195]** Clearly, no matter how Defendants' attorneys care to characterize the payments, such payments were not infrequent or sporadic as such payments were made on a daily basis, and in fact often occurred multiple times a day, with the result of many employees being paid in excess of 24 hours for a single day. **[Ex. "K" App. pgs. 244-255]** There is no question of fact that Defendants' pay scheme was an improperly administered task or job based payment scheme.

F. **Defendants have the burden of proof with regards to its exemption defense.**

In a misguided effort to avoid obvious liability in this case, Defendants have taken the position that despite having previously labeled certain payments made to Plaintiffs as "overtime " pay, Plaintiffs were not actually entitled to any overtime payments due to the MCA Exemption.

In 1938, Congress enacted the FLSA to "protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981); see also 29 U.S.C. § 202(a). One of the FLSA's requirements is that employers pay workers at one-and-a-half times their normal wages for hours worked in excess of forty per week. 29 U.S.C. § 207(a). However, there are exceptions to that general requirement. Relevant to this case, the MCA Exemption excludes from the FLSA's overtime pay mandate "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." 29 U.S.C. § 213(b)(1). **Exemptions are construed narrowly against the employer, and the employer has the burden of proving that an employee is exempt.** *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 402 (5th Cir. 2002). The employer must prove facts by a preponderance of the evidence that show the exemption is **plainly and unmistakably applicable**. *Meza v. Intelligent Mexican Marketing,*

*Inc.*, 720 F.3d 577, 581 (5th Cir. 2013).

### G. The MCA Exemption.

Under the MCA Exemption, the provisions of 29 U.S.C. § 207 do "not apply with respect to . . . any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions section 31502 of Title 49." 29 U.S.C. §213(b)(1). The Secretary of Transportation has the power to establish qualifications and maximum hours for employees who: (1) are "employed by carriers whose transportation of passengers or property by motor vehicle is subject to his [or her] jurisdiction under section 204 of the Motor Carrier Act," and (2) "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways . . . or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a). The burden of proving exempt status lies with the employer. *Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004). The SAFETEA-LU Technical Corrections Act of 2008 ("TCA") provides that the FLSA's overtime provisions apply to a "covered employee" notwithstanding the MCA Exemption. Pub. L. No. 110-244, 122 Stat. 1572. The TCA defines "covered employee" as an individual—

    (1)    who is employed by a motor carrier or motor private carrier.

    (2)    whose work, in whole ***or in part***, is defined—

        (A)    as that of a driver, driver's helper, loader, or mechanic; and

        (B)    as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce; and

    (3)    who performs duties on motor vehicles weighing 10,000 pounds or less.

Pub. L. No. 110-244, 122 Stat. 1572.

**"Thus, under the TCA, an employee who works for a DOT-regulated motor carrier or motor private carrier . . . and works on or with non-commercial vehicles (i.e., vehicles weighing 10,000 pounds or less) may now be entitled to overtime compensation."** *Allen v. Coil Tubing Servs., LLC*, 846 F. Supp. 2d 678, 705 (S.D. Tex. 2012). **"Because the TCA extends FLSA coverage to motor carrier employees whose work, even 'in part,' 'affect[s] the safety of operation of motor vehicles weighing 10,000 pounds or less,' the law does not exclude a motor carrier employee from FLSA coverage merely because his or her work also involves operating heavier vehicles."** *Aikins v. Warrior Energy Servs. Corp.*, No. 6:13-CV-54, 2015 U.S. Dist. LEXIS 32870, 2015 WL 1221255, at *5. See also *Faniola v. Proteus Servs., LLC*, 2015 U.S. Dist. LEXIS 138963, at *6-7 25 (S.D. Tex. Oct. 13, 2015).

Federal Courts, including the Southern and Western Districts of Texas, have ruled that the TCA limited the MCA Exemption and provided the FLSA's overtime protections to employees who worked on vehicles weighing both more and less than 10,001 pounds. These opinions include:

• *Roche v. S-3 Pump Service, Inc.*, 2016 U.S. Dist. LEXIS 82 (W.D. Tex. Jan. 4, 2016) ("Any employee driving certain vehicles less than 10,000 pounds must be paid overtime for any hours they work in a week over 40 . . . **Given the above 'in whole or in part' language, it is the *employer's burden* to demonstrate that the employees exclusively drove vehicles greater than 10,000 pounds during a workweek**.") (emphasis added)

• *Aikins v. Warrior Energy Servs. Corp.*, 2015 U.S. Dist. LEXIS 32870 (S.D. Tex. Mar. 17, 2015) ("This Court declines to adopt a reading of the TCA that any significant use of vehicles weighing more than 10,000 excludes an employee from FLSA coverage).

• *McMaster v. E. Armored Servs., Inc.*, 2013 WL 1288613, *4 (D.N.J. March 26, 2013) ("The [TCA] clearly defines a covered employee to include individuals "whose work, in whole or in part . . . affect[s] the safety of operation of" non-commercial vehicles [TCA] § 306(c)(2). It is embedded in the very definition of 'covered employees' that an employee's work need only involve the operation of non-commercial motor vehicles, in part, to be entitled to overtime.")

• *Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678, 705 (S.D. Tex. 2012) ("To be entitled to overtime pay, an employee must perform some meaningful work for more than

an insubstantial time with vehicles weighing 10,000 pounds or less.")

- *O'Brien v. Lifestyle Transp., Inc.*, 956 F. Supp. 2d 300, 305 (D. Mass. 2013) ("In sum, covered employees are entitled to overtime, regardless of the MCA [E]xemption. **The test is clear: if an employee works as a driver of motor vehicles that weigh less than 10,000 pounds in the provision of interstate transportation and is employed by a motor carrier, that employee is entitled to overtime pay under the FLSA.**"). (emphasis added)

- *Vanzzini v. Action Meat Distribs.*, 11-cv-4173, 2014 U.S. Dist. LEXIS 13781, *25- 27 (S.D. Tex. Jan. 31, 2014) ("After the SAFETEA-LU and TCA amendments, truck weight can be dispositive because the ***TCA carved out from the MCA exemption*** those drivers working with trucks weighing less than 10,000 pounds." The court denied the employer's summary judgment motion because a particular plaintiff ***"may*** have been given an assignment to complete a business-related task" using a vehicle weighing less than 10,000 pounds) (emphasis added).

- *Botero v. Commonwealth Limousine Serv.*, 12-cv-10428, 2013 U.S. Dist. LEXIS 104947, *36 (D. Mass. Apr. 12, 2013) ("the TCA expressly recognized that covered employees would receive compensation under the FLSA even though they were under the jurisdiction of the [DoT]. Moreover, the statutory language notes that there is overtime coverage if the employee's work "in whole or in part" is on vehicles that weigh less than 10,000 pounds.").

- *Hernandez v. Alpine Logistics*, LLC, 08-cv-6254, 2011 U.S. Dist. LEXIS 96708, *14, *17-18 (W.D.N.Y. Aug. 29, 2011) (Because "Section 306, clearly and unmistakably, provides that notwithstanding the existence of the [MCA] Exemption, employees who work on exclusively or in part on vehicles weighing less than 10,000 pounds are entitled to overtime compensation.").

- *Mayan v. Rydbom Express, Inc.*, 07-cv-2658, 2009 U.S. Dist. LEXIS 90525, *31 (E.D. Pa. Sept. 30, 2009) (holding that "Section 306(c) [of the TCA] clearly states that the employee's work need only 'in whole or in part' affect the safety of operation of vehicles weighing 10,000 pounds or less. . . . **In short, the employees must simply perform *some work* on such vehicles" to be entitled to overtime pay**). (emphasis added)

Thus, it is clear from the "in whole or in part" language of TCA section 306(c)(2) that Congress contemplated mixed fleets and duties and nevertheless determined that drivers and other employees working with vehicles weighing 10,000 pounds or less should receive overtime pay under the FLSA if their duties included, even in part, driving or working with noncommercial motor vehicles.

Plaintiffs performed work and duties as drivers "in whole or in part" involving motor vehicles with GVWR of 10,000 Pounds or less. As shown above, Plaintiffs without a doubt

performed numerous, meaningful and substantial work assignments and duties as drivers of motor vehicles with GVWR of 10,000 pounds or less while employed by Defendants during the relevant time period. All Plaintiffs have declared that they routinely and on at least a weekly basis, and as part of their continuing job duties throughout their employment with Defendants, drove the Support Vehicles during the course and scope of their employment. Plaintiffs state that they drove the Support Vehicles *more* than they drove commercial motor vehicles with GVWR of more than 10,000 pounds. The vans and the other Support Vehicles were driven in *every* convoy, and therefore would have been driven at *least* twice for every job. Plaintiffs were required to drive the vans and other non-commercial vehicles from and to hotels or man-camps where they stayed while performing pump services at various well locations, and while doing so, often transported tools and equipment at the same time. *Defendants* and Plaintiffs considered all travel time, including time spent driving to and from the man camps and hotels, as compensable time.[7] Plaintiffs also transported tools, equipment, and supplies to and from the Robstown office to the well sites, and worked on the Support Vehicles while at the shop. The man camp was just not a place of rest, but was a location owned by Defendants and used extensively by Plaintiffs to perform job duties for Defendants. In short, the use of the Support Vehicles was essential to the work performed by Plaintiffs, and Plaintiffs spent much more time driving the Support Vehicles than driving vehicles with a GVWR in excess of 10,000 pounds.

Finally, it should be pointed out that according to the Texas Western District, **the employer bears the burden** of demonstrating that the employees *exclusively* drove vehicles weighing in excess of 10,000 pounds during a workweek. *Roche v. S-3 Pump Service, Inc.*, 2016 U.S. Dist.

---

[7]Note that 29 CFR 785.50 (b)(2) provides that the Portal-to-Portal act is not applicable when there is a custom and practice by the employer to count travel time as compensable.

LEXIS 82 (W.D. Tex. Jan. 4, 2016) ("Any employee driving certain vehicles less than 10,000 pounds must be paid overtime for any hours they work in a week over 40 . . . **Given the above 'in whole or in part' language, it is the employer's burden to demonstrate that the employees exclusively drove vehicles greater than 10,000 pounds during a workweek**.") (emphasis added).

Defendants have admitted that they did not keep records as to when a Support Vehicle was driven by any of the Plaintiffs. **[Ex. "M" App. pgs. 351-363, Responses to Request Nos. 19 and 29]** Further, when requested to admit that the Representative Plaintiffs drove vehicles with a GVWR of 10,000 pounds or less during the course and scope of their employment, Defendants responded by stating that they had insufficient information to either admit or deny such a request for admission. **Id, App. pg. 360.** Accordingly, **such a response is an admission that Defendants cannot, *and will never be able to*, meet their burden of demonstrating that the Plaintiffs exclusively drove vehicles weighing in excess of 10,000 pounds during any particular workweek.** The only summary judgment evidence on the matter is that the Representative Plaintiffs drove vehicles weighing 10,000 pounds or less on a weekly, if not daily basis. **[Ex. "D" App. pgs. 92-133, Ex. "S" pgs. 41-43 App. pgs. 441-442, Ex. "V" pgs. 84, 100, 103-105 App. pgs. 557, 561-562]** Plaintiffs are therefore entitled to summary judgment with regards to the MCA exemption.

Note that Defendants have attempted to reduce the number of vehicles that would qualify for the TCA exception by claiming that all but the vans and the Ford Expedition are used to transport hazardous materials. Defendants have three trailers that they claim they can mount a hazardous materials placard, and that they *occasionally* transport hazardous materials with said trailers. Defendants take the position that *every* vehicle that could possibly pull the trailers are therefore used to transport hazardous materials. Despite such claims, Defendants have no records as to when any

of their vehicles with a GVWR of 10,000 pounds or less was ever used to transport hazardous materials. **[Ex. "H" pg. 27, 34-37 App. pgs. 210, 212]**

Defendants' claims regarding the transportation of hazardous materials using vehicles with a GVWR of less than 10,000 pounds is not remotely credible due to the fact that *none* of said vehicles have DOT numbers on them. Any vehicle used to transport hazardous materials in a quantity requiring placards, **must** have DOT numbers displayed on both sides of the vehicle. 49 C.F.R. § 390.5, 390.19(h)(3), and 390.21. Since none of the vehicles in Defendants' fleet with a GVWR of 10,000 pounds or less have DOT numbers displayed on them, such vehicles cannot legally be used to transport hazardous materials in a quantity requiring placarding. Finally, it should be noted that even if such vehicles were completely excluded from the analysis, summary judgment would still be warranted as the vans and Ford Expedition were driven on a weekly, and in some cases a daily basis by all of the Representative Plaintiffs. In other words, just as with the larger vehicles, Defendants cannot show that Plaintiffs *exclusively* drove vehicles used to transport hazardous materials during any given workweek.

### H. Computer Related Exemption.

Defendants' attempts to invoke the computer related exemption hardly bears mentioning. 29 C.F.R. § 541.400(b) requires that the employee be paid $27.63 per hour. Joshua Edward's stated hourly rate was $16.50 per hour. **[Ex. "N" App. pgs. 365-392]** Further, "the regulations provide that an employee's primary duty must require 'theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming, and software engineering' not merely' highly-specialized knowledge of computers and software.'" *Chicca v. St. Luke's Episcopal Health Sys.*, 858 F. Supp. 2d 777, 784 (S.D. Tex. 2012) (quoting *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 580 (6th Cir. 2004). There is no evidence that Joshua Edwards performed such highly-

specialized work and in fact records produced by Defendants indicate that Plaintiff Edwards was only paid 2 hours for performing technical support, and was otherwise engaged as a pump hand. **[Ex. "O" App. pgs. 394-417 (pgs. 400 & 406 showing 1 hour each for tech support), Ex. "P" pgs. 103-104 App. pg. 420, Ex. "R" pgs. 425-429]**

I.      **Plaintiffs are entitled to liquidated damages.**

An employer who violates the FLSA is liable for liquidated damages equal to the unpaid overtime compensation unless it is determined that the employer acted in "good faith" and had "reasonable grounds" to believe that its actions complied with the FLSA. 29 U.S.C. § 260. **Liquidated damages are awarded as a matter of course for violations of 29 U.S.C. § 207.** *Solis v. Hooglands Nursery, L.L.C.*, 372 Fed. Appx. 528, 530 (5th Cir. La. 2010). See also 29 U.S.C. § 216(b). Pursuant to 29 U.S.C. § 260, however, a district court may decline to award liquidated damages if the employer demonstrates that it acted reasonably and in good faith. *Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999). **Demonstrating good faith and reasonable grounds is a "substantial burden" borne by the employer.** *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 (5th Cir. 1998). A district court may not exercise its discretionary authority to reduce or eliminate a liquidated damage award unless the employer sustains the "substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon ...reasonable grounds." *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir.1990), quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir.1979) (emphasis in original); 29 C.F.R. §§ 790.15 and 790.22(c).

Defendants readily admit that they knew that they were not paying hourly wages based on actual hours worked, paid a uniform per diem, and did not include non-discretionary bonus payments in the calculation of Plaintiffs' regular rate of pay. It is frankly ludicrous for the Defendants to argue

that they made a good faith effort to comply with the FLSA based on the facts of this case.

**J.    Plaintiffs are entitled to a three year statute of limitations.**

If a violation of the FLSA was willful, a three-year statute of limitations applies. *See* 29 U.S.C. § 255(a). Under the FLSA, a violation is "willful" if the employer either "'knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute.'" *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2003) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, (1988)). Under the FLSA, penalties may be assessed against a party who repeatedly or willfully violates the FLSA. *See* 29 C.F.R. § 578.3. "All of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful." 29 C.F.R. § 578.3(c)(1). An employer's professed ignorance of the FLSA, shows a reckless disregard for the law. See *Yu G. Ke v Saigon Grill, Inc*. 595 F. Supp. 2d 240 (2008, SD NY).

Defendants readily admit that they knowingly did not pay wages based on actual hours worked. Defendants paid non-discretionary bonuses and a uniform per diem, without including such payments within the calculation of Plaintiffs' regular rate of pay. Defendants apparently believed that they were above the law, and completely failed to make even the most rudimentary attempt at paying employees proper overtime wages based on actual hours worked as required by law.

**V. CONCLUSION**

Defendants' own witnesses have testified that Defendants failed to pay Plaintiffs based on actual hours worked, and that Defendants failed to follow even the most basic requirements of the FLSA.  Defendants now attempt to hide behind the MCA Exemption, yet have empirically shown a complete lack of regard for the same laws that they now attempt to invoke for their protection. Clearly, Defendants believe that they are above the law.

**DATED** this 5th day of July, 2016.

Respectfully submitted,

_____

James Moulton
State Bar No. 24007712
Moulton & Price, P.C.
109 SH 110 South
Whitehouse, Texas 75791
Jim@moultonprice.com
Ph:  903-871-3163
Fax: 903-705-6860
*ATTORNEY FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing is being served on counsel for Defendants on the 5th day of July, 2016.

_____

James Moulton