United States District Court
Southern District of Texas
**ENTERED**
June 14, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOSHUA EDWARDS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:15-CV-299 |
| | § | |
| 4JLJ, LLC; dba J4 OILFIELD SERVICES, | § | |
| *et al*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER ON MOTION FOR SANCTIONS</u>

Before the Court is Plaintiffs' Motion for Sanctions (D.E. 225). Plaintiffs complain that Defendants 4JLJ, LLC d/b/a J4 Oilfield Services and John Jalufka (jointly J4) stonewalled discovery, denied the existence of available information, and ultimately allowed that information to be lost or destroyed, impairing Plaintiffs' ability to recover on the claims made in this case. J4 argues that its rights to the information sought were insufficient to support a duty to preserve or disclose it and any loss of the information is the fault of Plaintiffs for not seeking to compel discovery in a timely manner.

For the reasons set out below, the Court GRANTS the motion (D.E. 225) and imposes sanctions in the form of an adverse inference jury instruction and placement of the Technical Corrections Act burden of proof on J4. The Court further considers and DENIES Plaintiffs' First Amended Motion for Partial Summary Judgment (D.E. 252), which seeks summary judgment based, in part, on spoliation presumptions or the extrapolation of residual existing data to issues for which data was lost or destroyed.

## INTRODUCTION

Plaintiffs bring this case as a collective action under the Fair Labor Standards Act (FLSA), seeking unpaid overtime wages and other damages.  D.E. 18, 146.  J4 has pled the Motor Carrier Act (MCA) exemption as eliminating Plaintiffs' rights and remedies under the FLSA because Plaintiffs' work was governed by the Secretary of Transportation.  The MCA exemption is limited by the provisions of the SAFETEA-LU[1] Technical Corrections Act of 2008 (TCA).  More specifically, the TCA provides an exception from the MCA exemption—when Plaintiffs' work involved meaningful duties with respect to motor vehicles weighing 10,000 pounds or less (non-commercial vehicles).  Consequently, any evidence that demonstrates the number of hours Plaintiffs worked and whether their work involved one or more non-commercial vehicles is not only relevant, but critical to the claims and defenses in this case.

It is undisputed that J4 had installed in many of its vehicles—both commercial and non-commercial—a system licensed from FleetMatics that included a Global Positioning System (GPS) tracker.[2]  Together with key fobs issued to individual employees and key fob readers installed in the vehicles, the system recorded such things as the identity of the driver, the date and time the vehicle was turned on, the amount of time the vehicle ran,

---

[1]  The Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For Users or "SAFETEA–LU", PL 109–59, August 10, 2005, 119 Stat 1144 is not at issue in this case.  It is only the Technical Corrections Act that amended SAFETEA-LU that govern this case.

[2]  On September 21, 2011, J4 entered into its first Commercial Equipment and Subscriber Agreement with FleetMatics.  D.E. 234-5, p. 2.  J4 subscribed to vehicle tracking and reporting services and installed GPS trackers on at least some of its light-weight vehicles.  *Id.*, p. 5 (New Commercial Equipment and Subscriber Agreement). Between August 9, 2012 and January 20, 2014, J4 executed Services Order Forms, providing for additional or continued FleetMatics services for 36 months or until January 2017—which would have encompassed all times relevant to this action.  *Id.*, pp. 7, 11, 14.

the distance it traveled, and the path it followed.  All of this allowed J4 to observe the activities of its fleet in real time on computer monitors.  It also provided for the storage of data in FleetMatic's computer servers from which J4 could obtain reports through a software interface.  Those reports included data for activity filtered on a vehicle and/or driver basis.

The FleetMatics data was relevant to the allegations in this case in two important ways.  First, Plaintiffs claim that J4 required them to submit their time sheets using block increments of time that J4 prescribed on a task basis—not the hours they actually worked. The FleetMatics data could confirm whether Plaintiffs worked more hours than they were permitted to report.  Second, J4 has invoked the MCA exemption, seeking to eliminate the Plaintiffs' FLSA claims in a wholesale manner.   The FleetMatics data could corroborate or controvert Plaintiffs' assertions that they performed substantial work on non-commercial vehicles, bringing them within the TCA exception and eliminating J4's claimed MCA exemption.

The TCA is a relatively recent change in the law, straddling the requirements for making an FLSA claim and losing it to the MCA exemption.  Courts have been split on whether plaintiffs, with the burden to establish their FLSA claims, must show that they *did* work on non-commercial vehicles or whether defendants, with the burden to establish the MCA exemption, must show that plaintiffs *did not* work on non-commercial vehicles.  Thus, despite its determinative power, the FleetMatics data's practical utility to either side of the pending dispute depended not only on the content of the data but upon which

party had the burden to prove Plaintiffs' amount of work on non-commercial vehicles (the TCA issue).

In the midst of this uncertainty and prior to this Court's April 10, 2017 ruling placing the burden of proof on Plaintiffs, Plaintiffs sought the FleetMatics data from J4. J4 did not preserve it and did not produce it in discovery. Consequently, a large part of the data appears to have been lost or destroyed. Plaintiffs seek sanctions against J4 for spoliation.

## DISCUSSION

### A. Standard of Review

Under Federal Rules of Civil Procedure 26(g)(3) and 37, a court may sanction a party to litigation who fails to comply with the duty of disclosure and the duty to respond appropriately to requests for production and requests for admissions. A federal court also has the inherent power to sanction a party who has abused the judicial process. *Chambers v. NASCO*, 501 U.S. 32, 44 (1991). The spoliation of evidence is one such abuse. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010). "Spoliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (quoting *Rimkus*, 688 F. Supp. 2d at 612).

The party seeking imposition of a sanction for spoliation bears the burden of proof. *Rimkus*, 688 F. Supp. 2d at 615–16. That proof involves three elements:

> (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the

> destroyed evidence was "relevant" to the party's claim or
> defense such that a reasonable trier of fact could find that it
> would support that claim or defense.

*Id*.  Culpability sufficient to impose sanctions requires a showing of bad faith or bad

conduct.  *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005);

*Rimkus*, 688 F. Supp. 2d at 614.  Bad faith in this context generally means destruction for

the purpose of hiding adverse evidence.  *Guzman*, 804 F.3d at 713.

### B.  J4 Had a Duty to Preserve the FleetMatics Data

The duty to preserve evidence arises when a party has evidence that it knows or

should know is relevant to a claim that is in litigation or is likely to be litigated.[3]  *Rimkus*,

688 F. Supp. 2d at 612-13.

> [A]nyone who anticipates being a party or is a party to a
> lawsuit must not destroy unique, relevant evidence that might
> be useful to an adversary.  "While a litigant is under no duty
> to keep or retain every document in its possession . . . it is
> under a duty to preserve what it knows, or reasonably should
> know, is relevant in the action, is reasonably calculated to
> lead to the discovery of admissible evidence, is reasonably
> likely to be requested during discovery and/or is the subject
> of a pending discovery request."

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (ellipses in

original; citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991)

(quoting *Wm. T. Thompson Co. v. General Nutrition Corp*., 593 F. Supp. 1443, 1455

(C.D. Cal. 1984))).

---

[3]   There is no question that J4 was on notice of the relevance of the FleetMatics data to a potential FLSA claim when Plaintiffs gave informal notice that the claim would be filed (June 30, 2015), when Plaintiffs filed this action (July 13, 2015), and when J4 answered, alleging the MCA exemption (August 4, 2015), and more specifically recited the non-commercial vehicle issue of the TCA exception (September 14, 2015).  D.E. 1; D.E. 5; D.E. 12, pp. 2-4; D.E. 225-1, pp. 5, 7.  At all of these times, the FleetMatics contract was in full force and the data was fully accessible.  J4 has not argued otherwise and has not submitted controverting evidence.

"The party requesting an adverse inference must first show that the documents in question exist or existed and were within the control of the opposing party." *Jobe v. ATR Mktg., Inc.*, 189 F.3d 466 n.3 (5th Cir. 1999).  J4 disclaims any duty to preserve the FleetMatics data, arguing that it did not have the necessary possession, custody, or control to support imposition of any duty.  While the *Jobe* recitation of the duty to preserve may not state its full scope,[4] the Court finds that J4's disclaimer of control is not well-founded on our facts.

Both parties rely on FleetMatics' agreement, including its standard terms and conditions, to demonstrate whether J4 had possession, custody, or control sufficient to trigger a duty to preserve evidence.  The following discussion sets out the relevant terms and their significance to the question of the duty to preserve.[5]

---

**D.    ACCESS AND USE**

Subject to the terms and conditions of this Agreement, FleetMatics hereby grants Customer a non-exclusive, non-transferable limited right in the territory where the Customer is located as follows:

    a.  ***To access and use the Services until the last day of the Service Term***, consistent with any FleetMatics policies and additional use limitations specified or referenced in the order form and ***solely for the Customer's use***; and

    b.  ***To download, print, copy and use any documentation as reasonably necessary for its internal, in-house use*** related to the rights granted under subsection (a) above.

---

[4]  The Fourth Circuit has held:

> If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.

*Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001).  This holding has been applied in other jurisdictions.  And while the *Silvestri* case has been cited in the Southern District of Texas courts, we have found no recitation of this particular holding in the Fifth Circuit.  *E.g., Rimkus, supra.*

[5]  The FleetMatics terms and conditions are governed by Massachusetts law.  D.E. 234-5.  Neither party has briefed any issue of Massachusetts law pertaining to the construction of those terms.  Thus, the Court considers the terms and conditions according to the plain language in which they are written.

> FleetMatics reserves all rights not expressly granted herein.  Except as otherwise permitted herein, Customer may not copy, modify, adapt, or create **derivative works of the Services**.  Except as otherwise permitted herein, in no event shall Customer (i) use, or permit any third party to use, the Services for **time-sharing, rental, or service bureau purposes**, or (ii) decompile, disassemble, reverse assemble, or otherwise **reverse engineer** the Equipment or Services, or permit any third party to decompile, reverse assemble, or reverse engineer the Equipment or Services.  Customer will use the equipment and services only in compliance with applicable law.

D.E. 234-5 (emphasis added).  This provision reflects that J4 had the right to access and use the FleetMatics data in every way necessary to preserve it.  While it specifies "solely for the Customer's use," and "internal, in-house use," J4 has provided no authority for construing preservation of evidence—fully anticipated and empowered by the agreement and consistent with maintaining the business records the system generated—as something other than "J4's use."  Production of the data to a third party is a separate issue not relevant at this juncture.  The remaining language of this section, which addresses other copying and third-party access, prohibits use for the purpose of misappropriating FleetMatics' hardware or software design.  It is not directed to the content of the data, but the engineering by which it is processed and produced.

J4 argues that access to information should not be confused with control, citing *Dotson v. Edmonson*, No. 16-15371, 2017 WL 4310676 (E.D. La. September 28, 2017).  However, in *Dotson*, the parties resisting discovery (not the duty to preserve) were the employees of the non-party owner of the information.  They did not procure the compilation of information and there is no evidence that they had a contractual right to copy, print, or download the material for future use.  Rather, their access was permitted only for viewing the information.  Here, J4 is a subscriber who has paid for the right not only to access and view the information, but to copy, print, download, and preserve it.

There is nothing about the relationship between J4 and FleetMatics that impairs J4's right to preserve the data consistent with the purposes of its subscription.

Even if there is some question regarding J4's right to produce the information to third parties in this action, nothing about the relationship of the parties impairs J4's ability and right to preserve the information until disclosure issues can be adjudicated. Moreover, nothing about the duty to preserve this data, which involves unlimited print or digital duplication, would amount to illegally taking exclusive possession of something belonging to another.  Thus J4's reliance on *In re Grand Jury Subpoena*, 646 F.2d 963, 969 (5th Cir. 1981)[6] is inapposite.

As J4 notes in its response, even in the context of the duty to disclose in discovery (as opposed to the duty to preserve), the necessary control is construed expansively to include scenarios in which the responding party has the legal right or practical ability to obtain the information from another.  D.E. 234, p. 9 (citing *Duarte v. St. Paul Fire & Marine Ins. Co*., No. EP-14-CV-305-KC, 2015 WL 7709433, at *5 (W.D. Tex. September 25, 2015)).  Control is shown if the resisting party has a relationship with the non-party by affiliation, employment, or statute, which supports the party's authority or ability to obtain the document from the non-party.  *Duarte, supra*.  J4's subscription to FleetMatics' service was just such a relationship that gave J4 all of the rights it needed to preserve the data that FleetMatics' equipment generated from the J4 fleet.

---

[6]  In that case, a sole proprietor's business records could not be obtained by a subpoena directed against one of his employees (in derogation of the sole proprietor's Fifth Amendment rights against self-incrimination) when the employee's only right to the records was access for purposes of the business of the sole proprietorship.

The "Access and Use" terms of the FleetMatics agreement support a finding that J4 had the necessary control to preserve the data.

---

**H. INTELLECTUAL PROPERTY RIGHTS**

. . .

Copyright and all other intellectual property rights subsisting in the Service is owned by FleetMatics or the providers of such information*.*  The customer may use information retrieved from the Services only for its own use which means that *the Customer may not sell, resell, retransmit or otherwise make the information retrieved from the Services available in any manner or on any medium to any third party unless the Customer has obtained FleetMatics' prior written consent*.

---

*Id*. (emphasis added).  This section more specifically reflects FleetMatics' concern with defending its intellectual property rights.  The data it gathers from its customers, by itself, is not claimed as intellectual property.  It is the manner in which the data is processed and displayed that it seeks to protect.  This section reinforces J4's control over the data sufficient to preserve it.  FleetMatics only seeks to limit disclosure without its consent. J4 neither sought nor was denied this consent.

The "Intellectual Property Rights" terms do not affect J4's control for purposes of preservation.

---

**I. USE OF THE FLEETMATICS SERVICE**

The customer is responsible for all use of the Services made using any usernames and passwords registered by or allocated to it . . . .

FleetMatics may provide hypertext links to sites on the internet . . . FleetMatics . . . takes no responsibility for and gives no warranties, guarantees or representations in respect of linked sites. . . .

. . . FleetMatics assumes no responsibility for the accuracy of [maps, routing instructions and driving directions]. . . .

The Equipment and Services are designed to collect certain data and information from Customer's vehicles, including, without limitation, data regarding the location of the vehicles, rate of travel, ignition on/off, idle time, number of stops and other similar information (collectively "Vehicle Information").  Customer acknowledges and agrees that *as between Customer and FleetMatics, Fleetmatics owns all Vehicle Information,*

---

> *including all rights in and to such Vehicle Information*.  Without limiting the generality of the foregoing, Customer acknowledges and agrees that, *as the owner of the Vehicle Information, Fleetmatics may review, analyze, manipulate, copy and modify the Vehicle Information.  Fleetmatics may also distribute reports, analyses and data* based upon the Vehicle Information, provided, however that Fleetmatics agrees that it shall not disclose to any third parties any Vehicle Information that identifies specifically Customer or any of the drivers of Customer's vehicles.  It being understood, however, that the foregoing restriction shall not apply to disclosures of Vehicle Information that are (i) required by law or in response to a request from law enforcement authorities, (ii) made in connection with a **subpoena or other similar demand**, (iii) made in connection with a contemplated merger, acquisition or similar transaction, (iv) made to Fleetmatics' affiliates or related companies, and/or (v) made to Fleetmatics' service providers.

*Id*. (emphasis added).[7]   This language limits FleetMatics' responsibility regarding derivative services.  FleetMatics will serve the registered users and Customer is obligated to safeguard usernames and passwords.  FleetMatics will provide links to third party services whose websites Customer accesses without reliance on FleetMatics.  It will provide geographical information that Customer uses at its own risk.  And it will generate data that Customer cannot prevent it from using to further develop its engineering, coordinate with other service providers, use to advance its business operations, and disclose in conformity with the law.

By claiming ownership of the data, FleetMatics also ensures that Customer's access is guaranteed only while maintaining its subscription in good standing.  This "Use of the FleetMatics Service" provision does not change the fact that J4, as Customer, had the right to access the FleetMatics data until its subscription was terminated and could possess and preserve that data through any means by which it was copied, printed, or downloaded.

---

[7]   While FleetMatics is spelled with a capital "M" in the balance of this document and in other written communications, this section does not capitalize the "M" and the Court presents it as in the original.

---

**K.  CONFIDENTIALITY**

Both FleetMatics and the Customer will treat all information received from the other party that is marked "Confidential" or which is reasonably obvious to be confidential ("Confidential Information") as it would treat its own confidential information, but in no event shall either party employ less than a ***reasonable degree of care in protecting the Confidential Information.***  Confidential Information includes, but shall not be limited to:  pricing, business plans, customer lists, operational and technical data and product plans.

---

*Id.* (emphasis added).  This section does not prohibit preservation or disclosure.  It simply requires reasonable care in protecting confidentiality.  Thus, the only obligation created by this "Confidentiality" section is J4's obligation to FleetMatics to seek a protective order prior to disclosure, which has nothing to do with its obligation to the litigants and to this Court to preserve the evidence.

The Court's analysis of the terms and conditions is confirmed by the Declaration of David Niro, Senior Manager for Customer Operations of FleetMatics.  D.E. 264, pp. 6-9.  Niro states that, from and after June 2015, any subscriber such as J4 could download up to one year's worth of data without any assistance or authorization from FleetMatics and without any cost over and above the basic subscription price.  FleetMatics does not produce data that is less than one year old for litigation because it is readily available to the subscriber.  For data older than one year, FleetMatics would produce it for a subscriber, without necessity of a subpoena (but perhaps with a fee for any non-standard effort).  Only after the company was acquired by Verizon Communications, Inc. in February 2016, did FleetMatics require a subpoena to produce older data.

In sum, J4 had the full and unqualified right and ability to preserve the data that FleetMatics generated with respect to Plaintiffs' hours and work related to non-

commercial vehicles.  J4 could do so by using the software interface to copy, download, or print data reports, without the necessity of seeking special approval from FleetMatics and without undue burden.  J4 was entitled to this right to preserve data directly, as a paying customer of FleetMatics.  J4's rights of access and preservation were not dependent upon or derivative of any other non-party's rights.  And if J4 needed older data, it was readily available without necessity of subpoena or payment of any additional fee at the time Plaintiffs requested the data in October and December 2015.

J4 argues that FleetMatics' ownership interests and confidentiality concerns are such that Plaintiffs should have been required to seek the information directly from FleetMatics under the non-party subpoena power of Federal Rule of Civil Procedure 45.  *See* Fed. R. Civ. P. 34(c).  This argument addresses the duty to disclose rather than the duty to preserve.  J4 has provided no authority for the proposition that its duty to preserve evidence as a party to this federal action depends upon it having exclusive or superior control over the data vis-à-vis a non-party's rights.

For the foregoing reasons, the Court rejects J4's first argument that it did not have a duty to preserve the FleetMatics data because it did not own the data according to its contract.  Plaintiffs have satisfied their burden to demonstrate that J4 had a duty to preserve the FleetMatics data at a time when it had control of that data.

### C. J4 Breached Its Duty to Preserve in a Culpable Manner

J4 did nothing to preserve its FleetMatics data, clearly breaching its duty. Plaintiffs argue that J4's accompanying bad faith is apparent from its knowledge of the

existence and content of the data juxtaposed against its evasive discovery tactics. A timeline illustrates the relevant course of discovery[8] regarding the FleetMatics data:

| | |
|---|---|
| October 2, 2015 | Plaintiff Edwards propounded his requests for production of information encompassing FleetMatics data, such as GPS or satellite tracking records and employee identification key fob data. D.E. 225-1, p. 37. |
| October 9, 2015 | J4 objected to the time frame and breadth of the discovery requests and, subject to its objections, stated "none." D.E. 225-1, p. 49. |
| December 29, 2015 | Plaintiff Edwards, on behalf of opt-in Plaintiffs Gutierrez, Morales, Banda, Mares, Perez, and the putative class propounded their requests for production of information encompassing FleetMatics data and included requests for admission on the TCA/10,000-pound vehicle issue. D.E. 225-2, pp. 13-23. |
| February 11, 2016 | J4 claimed to have insufficient information on which to admit or deny requests for admissions regarding whether each of the Plaintiffs drove non-commercial vehicles. D.E. 225-2, p. 37. J4 claimed the request for FleetMatics data was overbroad in time frame and burdensome. *Id.*, pp. 48-49. |
| March 2, 2016 | Plaintiffs forwarded to J4 a draft motion to compel seeking disclosure of the FleetMatics data. D.E. 225-3, pp. 3-4; D.E. 234-2. |
| March 3, 2016 | J4 responded to the draft motion to compel, claiming that the requests were objectionable, "but we wouldn't have anything any way." D.E. 225-3, p. 14; D.E. 234-2. |
| March 21, 2016 | J4 substituted attorneys Munsch Hardt Kopf & Harr P.C. for Branscomb P.C. D.E. 41. |
| March 23-24, 2016 | J4 produced "happy camper" declarations claiming rare, non-substantial use of non-commercial vehicles and regular principal work on heavy vehicles. D.E. 225-3, pp. 17-69. At this time, J4 had full access to its FleetMatics data. |

---

[8]   In their recitation of relevant facts, Plaintiffs include discovery matters from *Ferrara v. 4JLJ, LLC*, No. 2:15-cv-00182, involving the same Defendant and the same attorneys on both sides of this dispute. In connection with this Order, the Court considers only the events that took place with respect to this action, brought by Plaintiff Edwards.

| March 29, 2016 | J4 responded to Plaintiffs' motion for summary judgment seeking to place the burden of proof for the TCA exception on Plaintiffs.  D.E. 44. |
| July 11, 2016 | Plaintiff Moreno propounded requests for production of FleetMatics data.  D.E. 225-3, pp. 71-83. |
| August 15, 2016 | J4 responded to requests for production, repeating previous objections, adding that such information is "not within J4's custody or control," and/or stating a relevancy objection, and "Subject to and without waiving the foregoing objections, none."  Some responses claimed to have already produced unspecified responsive documents.  D.E. 225-3, pp. 94-96; D.E. 234-3. |
| September 2016 | FleetMatics suspended J4's service for nonpayment.  D.E. 225-3, p. 101. |

Plaintiffs present this course of discovery as a campaign to deny the existence of the data, resist its disclosure, and to supplant the unfavorable objective data with favorable subjective testimony from friendly witnesses—all while the assignment of the burden of proof was in doubt.   J4 defends against these conclusions with a number of arguments, each of which will be addressed in turn.

**No Duty to Disclose Data**.   J4, relying on its argument that it did not have possession, custody, or control over the FleetMatics data, argues that it thus had no duty to disclose it in discovery.[9]   As set out above, the Court has concluded that J4 did have sufficient control over the data to have a duty to preserve it, which also supports a duty to respond appropriately to discovery requests.   *See generally*, Fed. R. Civ. P. 34(a)

---

[9]   J4 cites *Basin Expl. Inc. (Delaware) v. Tidewater Inc*., 139 F. App'x 605, 608 (5th Cir. 2005), for the proposition that a party does not resist discovery in bad faith if a licensing agreement prevents disclosure.  Setting aside this Court's decision that the FleetMatics agreement does not prevent disclosure, it is also noteworthy that the *Basin* appellate court found that the trial court's failure to grant an adverse inference to remedy the nondisclosure was a moot point as it would not have changed the result.

(allowing discovery of items within a party's possession, custody, or control, including electronically stored information).

J4 offers the Jalufka affidavit to controvert the argument that its failure to disclose evidences bad faith. D.E. 234-7. Jalufka claims that J4's position was based on the legal opinion of its counsel. This argument is unconvincing as the affidavit is self-serving, vague, and too general to constitute the assertion of an adjudicative fact. The affidavit does not identify the time frame of the legal consultation, the identity of the attorney or attorneys involved, the identity of Defendants' representatives in that discussion, or the legal basis for the alleged opinion. There is no corroborating attorney affidavit or opinion letter to support J4's assertions or any billing that would corroborate the legal effort expended.

To the contrary, in the final pretrial conference held October 17, 2017, counsel for J4 admitted that he had not assessed the existence or discoverability of the FleetMatics data. D.E. 234-4, pp. 18, 23. While J4 may have been referencing prior counsel, current counsel assumed defense of this action before Plaintiffs served their most recent discovery request targeting the FleetMatics data. D.E. 41; D.E. 225-3, pp. 94-96; D.E. 234-3. Additionally, parties have a continuing duty to supplement discovery and the rules include an attorney certification requirement. *See* Fed. R. Civ. P. 26(e), (g). The Court rejects the suggestion that J4's failure to respond appropriately to discovery requests was a matter of good faith reliance on legal counsel's assessment that discovery was not required.

If J4 were concerned that its duty to comply with the discovery rules conflicted with its contractual rights under the FleetMatics terms and conditions, then one would expect to see some evidence of a dialog with FleetMatics.   J4 could have inquired whether FleetMatics objected to J4's disclosures in this lawsuit under the "subpoena or other similar demand" clause of the "Use of FleetMatics Service" provision or under the consent clause of the "Intellectual Property Rights" provision.   But the record is silent on any such effort.   Alternatively, J4 should have submitted the matter to this Court for a determination, even if Plaintiffs should have had to seek the information from FleetMatics directly.   J4's choice to ignore its duties to preserve and disclose supports the inference that it wanted to suppress the contents of the data because it was unfavorable.

While the FleetMatics terms and conditions do raise issues of confidentiality, those issues do not relieve J4 from the obligation to acknowledge the existence of the information.   Issues of confidentiality or proprietary information trigger the right to seek a protective order pursuant to Federal Rule of Civil Procedure 26(c).   The rules of discovery thus provide J4 with the ability to seek a court order relieving it from the duty to disclose, protecting the confidential information, or referring Plaintiffs to a non-party pursuant to Rule 45 so that the non-party may protect its own interests.   Nothing in the rules permits a party to unilaterally deny the existence of evidence because it believes— in good faith or in bad—that the requesting party should not be entitled to compel its disclosure.

J4 argues that it did not actually deny the existence of the evidence.   Rather, when it responded "none" subject to its objections, it was only denying possession, custody, or

control of anything that was not unduly burdensome to produce.  This argument, made without benefit of authority, runs contrary to the discovery rules and does not explain counsel's assertion in response to the draft motion to compel that, even if the objections were overruled, "we wouldn't have anything any way."

Under Federal Rule of Civil Procedure 34(b)(2)(C), "An objection must state whether any responsive materials are being withheld on the basis of that objection."[10] According to the Advisory Committee Notes to the 2015 amendment that added this requirement, "The producing party does not need to provide a detailed description or log of all documents withheld, but does need to alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection."  Thus, to state "none" is to represent that no materials are being withheld pursuant to the objections.  This signaled to Plaintiffs that there was nothing to achieve by seeking a ruling on the objections and an order compelling discovery.  Responding "none"—when there were some—achieved the result of avoiding disclosure of potentially unfavorable evidence.  As applied here, it was a maneuver in bad faith.

**Good Faith Objections to Discovery Requests**.  J4 argues that its objections regarding time frame, relevance, and burdensomeness of production were appropriate, in good faith, and would have protected the FleetMatics data.  There is no evidence to support these objections or arguments.

---

[10]   This provision, added in 2015, prescribes the parameters of the practice that the court found confusing in *Heller v. City of Dallas*, 303 F.R.D. 466, 487 (N.D. Tex. 2014).  The amendments to the Federal Rules of Civil Procedure became effective December 1, 2015.  They govern all proceedings commenced after that date and, insofar as just and practicable, all proceedings then pending.  The Court finds that it is just and practicable for the amended rules to apply to this case.  This case was filed by Plaintiffs on July 13, 2015.  Although the initial discovery was propounded by Plaintiffs in October of 2015, there were similar discovery requests propounded by Plaintiffs after December 1, 2015.

- *Overbroad time frame*.   The FleetMatics data could only date back to September 2011, when J4 originally contracted with FleetMatics, less than four years prior to the date this case was filed.   And when Plaintiffs threatened to compel disclosure, J4's counsel did not suggest a reduced time frame, but claimed there were no responsive documents.

- *Irrelevant*.   No one has suggested in response to the pending motion for sanctions that the FleetMatics data lacked relevance to Plaintiffs' hours and the vehicles with which they worked.

- *Burdensome*.   The Jalufka affidavit states that the FleetMatics agreement required a subpoena to obtain the information from FleetMatics.   This, he states, "would result in high costs and time."   This assertion is not competent evidence as it is conclusory, vague, and speculative.   It further fails to address easy subscription access and the representation that there was no such information to be found.

Moreover, Jalufka does not address the fact that the FleetMatics agreement provides for disclosure upon its consent.   Jalufka does not describe any effort to obtain that consent or cooperation with discovery of J4's data or any burdens associated with it. There is thus no evidence of undue time, expense, or logistics needed to obtain the records from FleetMatics.   Obtaining the data could not be considered burdensome under those circumstances.

**The Fault Lies Elsewhere**.  J4 argues that any loss of the FleetMatics data was not its fault.  Rather the loss was due to an accident in non-party FleetMatics' system or its routine maintenance, unrelated to this litigation.  Alternatively, J4 argues that data was lost due to the passage of time because Plaintiffs failed to timely seek an order compelling J4's discovery responses.  Yet J4 had a hand in both of those issues.  And preservation is a duty independent of disclosure.

- *FleetMatics' Loss or Destruction*.  J4 neither preserved the FleetMatics data pursuant to its own access and control nor alerted FleetMatics of any need for it to do so.  J4 then delayed discovery and defaulted on its contract, causing FleetMatics to terminate J4's access and control prematurely.  D.E. 225-3, p. 101.  Once J4's contract was terminated, FleetMatics had no commercial reason to store or maintain J4's data.  This is the natural consequence of J4's default in paying FleetMatics' fees and there is no reason to believe that J4 was ignorant of the likely consequence of its default.

- *Plaintiffs' Delay*.  As outlined above, J4 misled Plaintiffs regarding the need to pursue a motion to compel by representing that it was not withholding any responsive information pursuant to its objections.  J4 cannot be heard to complain that Plaintiffs failed to take action when J4's representations induced that failure.

A party may be sanctioned where it skirted its discovery obligations and delayed producing explicitly requested files despite a duty to preserve and produce.  "Participation in such discovery abuse is indicative of insincere

intent and gamesmanship." *Realtime Data, LLC v. Metropcs Texas, LLC*, No. 6:10CV493 LED-JDL, 2012 WL 12904706, at *4 (E.D. Tex. Oct. 23, 2012). Moreover, the Court's concern is not only in how evidence might have been lost or destroyed, but in why the party with rights to the evidence failed to preserve it.  J4 had a duty to preserve the evidence whether or not Plaintiffs sought to compel its disclosure.

**Failure to Admit or Deny**.  Plaintiffs propounded requests for admission to J4, seeking admissions that they each "drove vehicles weighing less than 10,000 pounds while in the course and scope of his employment with Defendant."  D.E. 225-2, p. 37. Despite access to the FleetMatics data and the fact that a response would not require disclosure of any information to which FleetMatics claimed rights, J4 responded that it was without sufficient information to admit or deny.  This was another way to deny the existence of the data that J4 had a duty to preserve.  J4's briefing does not address this issue.

**Employee Affidavits**.  In addition, J4 has failed to address its procurement of affidavits from its employees that claim that J4's work involved only negligible use of non-commercial vehicles.  D.E. 91-1, pp. 2-55.  At the time that those affidavits were signed, J4 had full access to the FleetMatics data and could have relied on that more specific and objective data, had the data supported the assertion of minimal use.  What has now been recovered from the FleetMatics data reflects that non-commercial vehicles were used far more than represented in the affidavits.  *See* D.E. 252-2, pp. 13-16; D.E. 252-3.  J4 has not addressed this disparity between the data and the affidavits.  But the

disparity reinforces the conclusion that J4's failure to preserve and disclose the FleetMatics data was knowing and calculated to suppress unfavorable evidence. The attempt to supplant the objective evidence with the employee affidavits is some evidence of bad faith.

**Conclusion**. J4 took action that diverted attention from the FleetMatics data long enough for it to be lost or destroyed. Spurious objections, the denial that the evidence existed, blaming Plaintiffs for not seeing through the obfuscation, and offering replacement evidence that contradicts what the FleetMatics data, once recovered, demonstrates are all evidence of a culpable breach of the duty to preserve the evidence.

### D. The FleetMatics Data Was Relevant; Its Loss Is Prejudicial

It is undisputed that the FleetMatics data that has been lost or destroyed is relevant to Plaintiff's claims regarding the number of hours worked and to the TCA exception regarding whether Plaintiffs worked with non-commercial vehicles. Its loss is prejudicial because it was singularly probative and cannot be duplicated. While there may be additional residual data that could be resurrected, the prospects are dim and the cost is high, such that the discovery is no longer proportionate as required by Federal Rule of Civil Procedure 26. *See* D.E. 252, p. 3. Without that clear and objective evidence, Plaintiffs have to rely on their likely incomplete memories, subject to a jury's credibility determinations in the face of subjective interested-witness testimony of current employees proffered by J4. And the issues Plaintiffs have to prove require facts on a week-by-week basis, such that no one instance of showing work with non-commercial vehicles can eliminate the MCA exemption for remaining weeks. *E.g, Spangler v.*

*Mourik, L.P.*, No. CV H-16-0349, 2017 WL 3412117, at \*16 (S.D. Tex. Aug. 8, 2017)

(citing *Hernandez v. Alpine Logistics, LLC*, No. 08–CV–6254T, 2011 WL 3800031, at \*5

(W.D.N.Y. Aug. 29, 2011) (discussing Department of Labor, Wage & Hour Division,

Fact Sheet # 19[11] (Nov. 2009))).

Plaintiffs have incurred the time and expense necessary to defend against J4's

summary judgment motion seeking to eliminate Plaintiffs' claims based on the MCA

exemption—a motion that might not have been filed had the evidence supporting the

Plaintiffs status with respect to the TCA exception been readily available.  Plaintiffs have

further proceeded with discovery, including taking John Jalufka's deposition without the

benefit of being able to question him on the content of the data.  Plaintiffs are prejudiced

because of J4's breach of the duty to preserve both with respect to their ability to prove

their case and with respect to the expense they have incurred, and will continue to incur,

to litigate this action.

## SUMMARY FINDINGS AND CONCLUSIONS

In addition to the findings of fact and conclusions of law set out in the above

analysis, the Court finds and concludes:

1.   J4 had possession, custody, and/or control over the FleetMatics data
     sufficient to support a duty to preserve it;

2.   J4 had possession, custody, and/or control over the FleetMatics data
     sufficient to support a duty to disclose the data or its existence in discovery;

---

[11]   Available at http://www.dol.gov/whd/regs/compliance/whdfs19.pdf.

3.  J4 had the duty to preserve the FleetMatics data no later than June 30, 2015, when it was put on notice of Plaintiffs' potential claims;

4.  The FleetMatics data existed and was fully available to J4 between at least June 30, 2015 and September 1, 2016;

5.  J4 had the duty to preserve the FleetMatics data because it knew, or reasonably should have known, that it was relevant to a claim or defense in the action;

6.  J4 had the duty to preserve the FleetMatics data because its preservation was not burdensome as that term is used with respect to proportionate issues in discovery;

7.  J4 breached its duty to preserve the FleetMatics data by failing to put a litigation hold on it and/or by failing to copy, print, or download the information, which was available to it by easy computer command;

8.  Some of the FleetMatics data was lost or destroyed at a time after J4 had a duty to preserve it and could have done so;

9.  The FleetMatics data to which J4 had access showed the hours that Plaintiffs actually worked;

10. The FleetMatics data to which J4 had access showed the vehicles with which Plaintiffs worked and the amount of time Plaintiffs worked with them;

11.  The amount of the FleetMatics data lost or destroyed has impaired Plaintiffs' ability to prove their claims regarding the number of hours they worked;

12.  The amount of the FleetMatics data lost or destroyed has impaired Plaintiffs' ability to prove their claims regarding the amount of work they performed using non-commercial vehicles;

13.  J4's acts and omissions regarding the FleetMatics data, the failure to preserve the data, and J4's resistance to discovery were knowing and intentional.

14.  J4 permitted the loss or destruction of the FleetMatics data with a culpable state of mind and in bad faith because J4:

   a.  Had access to the content of the data and, knowing what it would prove, chose to take steps to avoid its preservation and disclosure;

   b.  Concealed the existence of the data;

   c.  Asserted baseless objections to the data's disclosure;

   d.  Misled Plaintiffs regarding the likelihood of practical success of a motion to compel;

   e.  Shifted blame to Plaintiffs after misleading them;

   f.  Defaulted on the FleetMatics contract and prompted its early termination, paving the way for FleetMatics to lose or destroy the data;

g.   Procured favorable employee affidavits in lieu of the data that contradict the data that has been recovered; and/or

h.   Failed to admit or deny whether Plaintiffs worked on non-commercial vehicles, which did not require disclosure of FleetMatics data.

15. The lost or destroyed evidence was relevant to Plaintiffs' claims and J4's defenses because it had probative effect regarding the number of hours Plaintiffs worked;

16. The lost or destroyed evidence was relevant to Plaintiffs' claims and J4's defenses as it had probative effect regarding whether and how much Plaintiffs worked with non-commercial vehicles;

17. The loss or destruction of evidence has prejudiced Plaintiffs' ability to demonstrate the exact number of hours they worked and the weeks in which they worked hours in excess of those reported;

18. The loss or destruction of evidence has prejudiced Plaintiffs' ability to demonstrate that they worked with non-commercial vehicles in more than a de minimus manner and the weeks in which they engaged in that work;

19. J4's failure to comply with its duty to preserve evidence constitutes an abuse of the judicial process;

20. J4's failure to comply with its discovery obligations, both with respect to the duty to disclose under Federal Rules of Civil Procedure 26 and requests

for production and requests for admissions, and duty to supplement constitutes an abuse of the judicial process.

**E. Sanctions**

The Fifth Circuit has summarized the parameters for the exercise of federal court power to issue sanctions as follows:

> For nearly as long as the federal courts have existed, it has been understood that "[c]ertain implied powers must necessarily result to our courts of justice from the nature of their institution," powers "which cannot be dispensed with in a court because they are necessary to the exercise of all others." The Constitution itself confers this authority upon all Article III courts as an incident to "The judicial Power." The inherent powers of the federal courts are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." At the same time, however, these powers must be exercised "with restraint and discretion." As we have said, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." In short, the inherent power springs from the well of necessity, and sparingly so.

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406–07 (5th Cir. 1993) (citations omitted).

Sanctions should deter spoliation, place the risk of the loss of favorable evidence on the one who created that risk, and restore the prejudiced party to same place it would have occupied absent wrongful destruction. *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011); *Rimkus*, 688 F. Supp. 2d at 645-46. Sanctions may also be imposed to prevent abuse of the judicial system, promote judicial efficiency, and

reimburse a party for fees and expenses incurred in seeking a remedy for spoliation. *Ashton,* 772 F. Supp. 2d at 801; *Rimkus*, 688 F. Supp. 2d at 647.

"[T]he severity of a sanction for failing to preserve when a duty to do so has arisen must be proportionate to the culpability involved and the prejudice that results." *Rimkus*, 688 F. Supp. 2d at 618. Had Plaintiffs been unable to obtain any of the FleetMatics data, J4's conduct would have been sufficiently egregious and so prejudicial as to justify an extreme sanction of dismissal or default. *See Rimkus*, 688 F. Supp. 2d at 618. Only because Plaintiffs can offer the jury some of the objective evidence supporting their claims does the Court refrain from striking J4's MCA exemption defense in its entirety.

Instead, the Court will provide the jury with an adverse inference instruction that instructs the jury that J4 and John Jalufka failed to preserve FleetMatics data after the duty to preserve it had arisen and that a substantial amount of that data has been lost or destroyed as a foreseeable result. The jury will be further instructed that, if it finds the missing FleetMatics data relevant and its destruction prejudicial to Plaintiffs, the jury may draw an inference that the evidence was favorable to Plaintiffs on both issues: (a) the hours Plaintiffs worked; and (b) whether Plaintiffs fall within the TCA exception. *See Rimkus*, 688 F. Supp. 2d at 619.

The Court acknowledges that in its Order of April 10, 2017, it placed the TCA burden of proof on Plaintiffs and, since that time, the Fifth Circuit has ruled that the burden of proof is indeed on Plaintiffs. *Carley v. Crest Pumping Technologies, L.L.C.*, No. 17-50226, 2018 WL 2246178 (5th Cir. May 16, 2018). Nonetheless, the Court will

order, as a sanction, that J4 bears the burden of proof to demonstrate that Plaintiffs do not fall within the TCA exemption.

The Court's rulings modify the parameters by which J4's liability is to be assessed with respect to the MCA exemption, TCA exception, and fact issues relating to the adverse inferences permitted as a spoliation sanction.  Consequently, the parties' briefing with respect to Plaintiffs' first amended motion for partial summary judgment (D.E. 252) is predicated on positions no longer applicable and largely involve fact issues with respect to the adverse inferences to be drawn and the credibility of the J4 affidavits.  The Court will deny the motion for partial summary judgment as moot.

At this time, the Court will deny Plaintiffs' request for attorney's fees without prejudice.

## CONCLUSION

For the reasons set out above, the Court GRANTS the motion for sanctions (D.E. 225) and ORDERS as follows:

- The Court GRANTS Plaintiffs' request for an adverse inference instruction that will advise the jury that J4 breached its duty to preserve evidence and instruct the jury to presume that the evidence was favorable to Plaintiffs upon finding that it was relevant and its loss or destruction was prejudicial;

- The Court ORDERS that, as a sanction, the TCA burden of proof lies on J4;

- The Court DENIES as moot Plaintiffs' first amended motion for partial summary judgment (D.E. 252); and

- The Court DENIES without prejudice Plaintiffs' request for attorney's fees.

ORDERED this 14th day of June, 2018.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE