**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **JOSHUA EDWARDS Individually and on Behalf of All Others Similarly Situated** | § § § § | |
| | § | **Docket No. 2:15-CV-00299** |
| **Plaintiff(s)** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **4JLJ, LLC DBA J4 OILFIELD** | § | |
| **SERVICES and JOHN JALUFKA** | § | **COLLECTIVE ACTION** |
| | § | **PURSUANT TO 29 U.S.C. § 216(b)** |
| **Defendants.** | § | |
| | § | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR NEW TRIAL**

Defendant 4JLJ, LLC ("4JLJ") and Co-defendant John Jalufka ("Mr. Jalufka") respectfully request this Court deny Plaintiffs' *Renewed Motion for Judgment as a Matter of Law, or in the Alternative Motion for New Trial*, because the jury verdict is supported by readily identifiable record evidence, and the Motion otherwise is premised on flawed characterizations of law.

## I.    SUMMARY OF RESPONSE

The Plaintiffs' group (hereafter, "Plaintiffs") contend the trial record purportedly contains *no* evidence disfavoring them regarding:  (1) the discretionary nature of bonuses paid by Defendant 4JLJ, LLC ("4JLJ"); (2) the accuracy with which 4JLJ tracked time and compensated its employees, (3) the proper designation of 4JLJ as the pertinent "employer," and (4) application of the "TCA Exception" to the federal Motor Carrier Act's exemption.  The principal (though not exclusive) error with Plaintiffs' contentions is one need only review the many places in the record that contain *precisely* the evidence Plaintiffs contend is lacking.

1

The jury relied on that evidence, and there is no basis to infer otherwise.  Its verdict in favor on 4JLJ and Mr. Jalufka (collectively, "Defendants") therefore was proper.

Plaintiffs' Motion additionally is flawed because its characterizations of the law are contrary to the plain language of the provisions in the Fair Labor Standards Act ("FLSA") it purports to rely upon.   For that independent reason, Plaintiffs' Renewed Motion for Judgment as a Matter of Law, or in the Alternative Motion for New Trial, should be denied.

## II.      PLAINTIFFS ARE NOT ENTITLED TO RELIEF FROM THE JURY VERDICT

### A.      In No Event Have Plaintiffs Premised their Substantive Contentions on Binding Legal Authority

The most fundamental defect with Plaintiffs' contentions are they simply are not premised on legal authority that binds this Court.  Plaintiffs pleaded the FLSA as the basis for its claims for relief, but Plaintiffs are not premising their request for judgment (or new trial) on legal mandates derived from the plain language of FLSA, or even "regulations" reflecting a legally consequential interpretation of the FLSA by the Department of Labor ("DOL").

Plaintiffs instead are relying upon non-binding "interpretative bulletins" issued by the DOL, which do *not* have the force of law and are *not* entitled to the level of deference reserved only for lawfully promulgated regulations.  4JLJ and Mr. Jalufka previously briefed this issue in a proposed submission to the Court, *see* (Doc. 201-1), and incorporate that briefing by reference; but herein demonstrate Plaintiffs have not relented with respect to their improper reliance on non-binding characterizations of the law, which do not align with the FLSA's plain language.[1]

---

[1] Defendants address this issue at the outset, based on a convention whereby it perhaps is appropriate to first address what the law "is," before addressing issues regarding application of law to fact.  This is not, however, meant to imply Defendants contend resolution of this issue is essential for the jury verdict to be preserved.  The evidence discussed below reflects even assuming *arguendo* Plaintiffs' construction of the law were correct (though it is not), Defendants propounded evidence whereby the jury still could (and

The statutory concept of the "regular rate," which informs the FLSA mandate on which Plaintiffs purportedly have based their claims, is found in 29 U.S.C. § 207(a)(1) and reads as follows:

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the *regular rate* at which he is employed.

(emphasis added).

As discussed below, Defendants proved at trial (through readily identifiable testimony and documentary evidence) 4JLJ accurately compensated its employees for both their basic rates of pay, as well as "overtime" rates. *No argument herein should be understood to indicate or imply otherwise*.

Plaintiffs nevertheless assume (contrary to the record) 4JLJ's payment methods were imprecise, and further contend—then criticize 4JLJ for not only paying its employees for the hours they *actually* worked, but for paying the employees when they purportedly did *not* work. 4JLJ reiterates *that is not what the proof at trial demonstrated*; but even had it, Plaintiffs' attempt to equate conduct of that kind with a FLSA violation is not supported by the plain language of the FLSA.

For instance, 29 U.S.C. § 207(e)(2) states the regular rate of pay:

> shall *not* be deemed to include . . . payments made for

---

did) find in Defendants' favor.  Defendants therefore brief the immateriality of the "interpretive bulletins" to protect against waiver—but respectfully submit the Court need not resolve the issue.  The below factual sufficiency discussion independently warrants denial of Plaintiffs' Motion.

> occasional periods when *no work* is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other *similar* payments to an employee which are *not* made as compensation for his *hours* of employment . . . .

(emphasis added). The unifying theme between the various examples in § 207(e)(2) is they *nonexhaustively* illustrate pay given for *non*-work is <u>not</u> charged against the employer when calculating the "regular rate of pay." *Cf. Minizza v. Stone Container Corp.*, 842 F.2d 1456, 1461 – 62 (3rd Cir. 1988) ("The phrase 'other similar payments . . . not made as compensation for hours of employment' does not mean *just* other payment for idle hours or reimbursements, the two types of payments set forth in the two preceding clauses of the section, but payments not tied to *hours* of compensation, of which payments for idle hours and reimbursements are only two *examples*. This interpretation gives independent meaning to the third clause.") (emphasis added).

Notwithstanding the plain language of 207(e)(2), Plaintiffs contend 4JLJ purportedly made overly generous payments that did not correspond with "hours of employment," which Plaintiffs contend should be folded into their regular rate for purposes of calculating overtime wages. This (misguided) contention is premised entirely upon interpretative materials found at Part 778, 29 C.F.R.

But those materials have no legally dipositive significance, and indeed contravene the plain language of FLSA § 207(a)(1) and 207(e)(2). The content of Part 778 should be understood to have the limited utility of serving as *non*binding guidance regarding the DOL's administration of its *own* duties under the FLSA:

> This part 778 constitutes the official interpretation of the

4

> Department of Labor with respect to the meaning and
> application of the maximum hours and overtime pay
> requirements contained in section 7 of the Act.  It is the
> purpose of this bulletin to make available in one place the
> interpretations of these provisions which will guide *the
> Secretary of Labor* and the *Administrator* in the
> performance of *their* duties under the Act unless and until
> they are <u>otherwise</u> directed by authoritative decisions of the
> *courts* . . . that it is *incorrect*.

29 C.F.R. § 778.1 (emphasis added).  *See also Howard v. City of Springfield, Ill.*, 274 F.3d 1141, 1146 (7th Cir. 2001) ("Rather than focus on the language of the statute, the parties get bogged down in the language of [a bulletin] interpreting this provision.  We note that [it] is an interpretive bulletin from the Department of Labor, as are all sections in Part 778. . . .  As an interpretive regulation, it does not have the force of binding law."); *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268, n.5 (11th Cir. 2008) ("In our initial opinion in this case, we characterized [a Part 778 provision] as a 'regulation.'  That is exactly how both parties, in their briefs and at oral argument, characterized it.  *They and we were wrong*. . . . [It] is in fact an interpretative bulletin, *not a regulation*.") (emphasis added).

4JLJ (and Mr. Jalufk—although he in no event the "employer") acknowledges courts sometimes attribute weight to agency interpretive guidance like the bulletins, but that only occurs when courts elect to afford a modest form of deference know as "*Skidmore*" deference—which derives from the case *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  *Cf. Griffin v. S & B Eng'rs & Constructors, Ltd.*, 507 Fed. Appx. 377, 383 (5th Cir. 2013) ("The interpretative statements issued by the [DOL] are *not* promulgated regulations, but do provide insightful guidance to courts in evaluating claims brought under the FLSA.") (emphasis added).

The operation of *Skidmore* deference is not, however, uncritically forgiving of an agency's views, and in no event supplants the plain language of an underlying statute:

> [The Bulletins] are not, of course, conclusive, *even in the*

> *cases with which they directly deal*, much less in those to
> which they apply only by analogy.  They do not constitute
> an interpretation of the [FLSA] or a standard for judging
> factual situations which binds a district court's processes,
> as an authoritative pronouncement of a higher court might
> do.

*Skidmore*, 323 U.S. at 139 (emphasis added).  *See also Hills v. Entergy Operations, Inc.*, No. 16-30924, 2017 WL 3324928, *4 (5th Cir. 2017) ("in any event, '[i]nterpretive and opinion letters by the Department of Labor do not *per se* bind the court.'") (quoting *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 638 – 39 (5th Cir. 2001)).[2]

In light of the foregoing principles, Plaintiffs' proffered construction of the FLSA, whereby 4JLJ purportedly could be penalized for paying certain employees *too* much money, is mistaken and cannot provide the grounds to set aside the verdict.  But for the reasons discussed below; irrespective of Plaintiffs' misconstruction of the law, the evidence presented at trial simply does not allow the jury's verdict to be disregarded.

**B.      Plaintiffs Cannot Satisfy the Standards for Relief from the Jury's Verdict**

1.   The Restrictive Rule 50(b) Standard

Unless a party raises a Federal Rule of Civil Procedure 50(a) request for judgment as a matter of law on specifically identifiable issues, before the issues are submitted to a jury, a post-verdict Rule 50 challenge to any omitted issue is waived.  *See Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 236 (5th Cir. 2001); *Chrimar Sys. v. Alcatel-Lucent Enter. USA*, NO. 6:15-CV-00163-JDL, 2017 U.S. Dist. LEXIS 19587, *7, n.2 (5th Cir. 2017).  With respect to properly preserved issues, a court may grant judgment as a matter of law only if "a party has been fully

---

[2] Because the bulletins are not formally promulgated federal "regulations," they are not entitled to the elevated (and in itself increasingly controversial) deference contemplated in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."  FED. R. CIV. P. 50(a)(1).

This standard is decidedly restrictive, because a "court can reverse a jury verdict 'only when reasonable minds in the exercise of impartial judgment could not have arrived at that verdict.'"  *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 236 (5th Cir. 2001).  In that respect, all evidence of record must "conclusively favor" the party requesting Rule 50 relief.  *See Chrimar Sys. v. Alcatel-Lucent Enter. USA*, NO. 6:15-CV-00163-JDL, 2017 U.S. Dist. LEXIS 19587, *6 (5th Cir. 2017).

The practical manner by which a court applies this standard is that "in entertaining a motion for judgment as a matter of law, a reviewing court must appreciate that 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Id*.  A court also "must draw all reasonable inferences in favor of the nonmoving party . . . ."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  As such, a "court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is *uncontradicted* and *unimpeached*, at least to the extent that that evidence comes from *disinterested* witnesses.'"  *Id*. at 151 (emphasis added).

### 2.   The Equally Restrictive Rule 59 Standard

Plaintiffs make a Rule 59 request for new trial contending the jury verdict is "against the weight of the evidence."  Plaintiffs relegate their discussion of that standard to a single paragraph, *see* (Doc. 324, Page 24 of 26), without deviation from their proffered rationales for their Rule 50 challenge.

The Rule 59 standard is no more forgiving to Plaintiffs, because "[w]hen a new trial is

requested on . . . evidentiary grounds, the motion should not be granted unless the verdict is against the great, not merely the preponderance, of the evidence." *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989).  The practical expression of this restrictive standard is "all the evidence must be viewed in a light most favorable to the jury's verdict, and the verdict *must be affirmed* unless the evidence points 'so strongly and overwhelmingly in favor of one party that the court believes that reasonable [persons] could not arrive at a contrary [conclusion].'"  *Id.* at 987 (quoting *Whatley v. Armstrong World Industries, Inc.*, 861 F.2d 837, 839 (5th Cir. 1988)).

### 3.   Plaintiffs are not Entitled to Judgment as a Matter of Law *or* New Trial

Plaintiffs have not directed this Court to *any* "uncontradicted," "unimpeached" evidence from a "disinterested witness" to warrant reversal of the jury verdict; or that "strongly and overwhelmingly" compels the conclusion the jury <u>only</u> could have resolved this case in Plaintiffs' favor.  4JLJ presented evidence to controvert every single theory Plaintiffs advanced as purported grounds for recovery, as summarized *without exclusion* below:

#### i.   *Record Evidence Bonuses were Discretionary*

Plaintiffs contend there was no evidence whereby a reasonable jury could have concluded bonuses paid by 4JLJ were *not* guaranteed, *see* (Doc. 324, Pages 2 of 26 – 4 of 26), but even certain Plaintiffs testified to the contrary.  For instance, Armando Garcia testified as follows:

> Q   And that is your understanding, correct, that you were not guaranteed any sort of bonus by Mr. Jalufka, correct?
>
> A   Not that I know of, no, because, like I said, he – I don't know how to describe this, a big heart.  I don't think it was something that any company *has to do* and I'm sure that's why they call it a performance.
>
> Q   And there were, in fact, times where you didn't receive a quarterly bonus, correct?

> A   There may have been a time or two.  I can't recall.
>
> Q    So Mr. Jalufka could give you the bonus or he could not?
>
> A   He's the owner.  He can do --
>
> Q   That was his discretion.
>
> A   That's – I'm assuming yes.

February 20, 2019 Trial Transcript, 279:9 – 21.

> Plaintiff Steven Poff moreover admitted:
>
> Q   And so while it would be nice to get, you were hopeful of getting it.  You knew that it was totally discretionary with 4JLJ, right?
>
> A   That's correct.
>
> Q   Correct?
>
> A   That is correct.

February 21, 2019 Trial Transcript, 105:12 – 17.

Although evidence of record independently proves the point, Mr. Jalufka also refuted Plaintiffs' assertion bonuses were non-discretionary.  *See* February 21, 2019 Trial Transcript, 190:15 – 191:7.  The jury found evidence of this kind more compelling.

> ii.   *Record Evidence of Accurate Payments for Hours Worked*

Plaintiffs contend something nefarious should be read into the manner in which 4JLJ's employees' time was tracked on "tickets" used by the employees to report the time.  *See* (Doc. 324, Pages 5 of 26 – 8 of 26).  According to Plaintiffs, when those tickets reflected a high number of hours in any given day—Plaintiffs suggest the tickets simply *must* be evidence of inaccurate time keeping and corresponding wrongful compensation for hours the employees purportedly did *not* work.  *Id.*

To the contrary, testimony at trial proved all such time was for work the employees

performed—though in very rare instances clerical errors (or even dishonesty by a few *employees*) are reflected on the time sheets and tickets:

> Q  And along with you, Becky and Ray would confirm that your timesheets were accurate and showed the actual hours you worked, correct?
>
> A Yes.
>
> Q That was one further way that J4 ensured that they were accurate, they put people in charge of looking at those, correct?
>
> A Yes.
>
> Q Now, J4 would also ensure the time was being marked correctly for the actual hours by having supervisors such as Ray Carrillo check sheets, but also let you guys know how many hours you worked out on the frac site, cir?
>
> A Yes.

February 20, 2019 Trial Transcript, 250:19-251:6 (Garcia Testimony).

Mr. Jalufka testified:

> Q Did J4 pay its employees based on their actual hours worked?
>
> A Yeah, they paid them on their hours actually worked. Yes sir.

February 21, 2019 Trial Transcript, 193:4-7.

But to by clear, as to the fundamental question whether employee records reflect 4JLJ ever paid *less* than the hours Plaintiffs actually worked, the 4JLJ employee principally responsible for payroll (Rebekkah Clark) testified:

> Q   And you haven't seen a single example today from Counsel that an individual was paid less than what his hours indicated, have you?
>
> A No, sir.
>
> . . .
>
> Q   [S]o what happens if, for example, on an eight-hour ticket, I work 12 hours physical labor, plus on-call, standby, all the other good things?

A   You'd get paid for it.

. . .

Q   Do you know whether or not there are ever times the employees got paid on their paycheck less money for a days' work than they actually did?

A   Never.

February 20, 2019 Trial Transcript, 106:15 – 18; 107:20 – 23.

Witnesses (*including Plaintiffs*) otherwise undercut their alternative theory of the case that 4JLJ systemically was *over*paying them.  For instance, Ms. Clark testified:

Q   But that's not his actual hours then on that, right?

A   Each ticket is actual hours.

Q   Each ticket --

A   His timesheet, he wrote that down as his actual hours so we reviewed his actual hours.

Q   The 32 --

A   On those timesheets, each of them, they show that they were paid out eight hours on them, those were actual hours.

Q   How --

A   Each job, there's rig up, they actually do their job, there's standby.  Sometimes they have to be on call for the remainder of that job.  *Those are all actual hours*.

Q   Is there some kind of a record that shows they spent -- actually spent eight hours at that job?

A   I'm not saying that they actually spent eight hours at that job, I'm saying they're responsible for that job, for that whole eight hours.

Q   So they get eight hours whether they actually worked it or not?

A   It's actual work.

Q   What if they do --

A   What are you referring to as actual work?   Physical labor or *standby* or --

Q   Describe for me standby, that's an interesting term.

A   Standby, from what I understand when they're out on a job sometimes they go out there, they rig up, then *they have to wait* until the company man – there's other companies out there working as well, *and they wait* until it's their time to pressure up or whatever they do, and sometimes they're there for several hours waiting.

. . .

Q   Okay, so, for example, I'll throw out a low number just to do for -- for sakes.   Let's say four hours of physical activity, okay?   So that leaves 14 hours.

   Once an employee is done with his four hours, is he allowed to go to the movies, turn off his phone, start eating popcorn, and hang out?

A   No, sir.

Q   What happens for these other 14 hours?

A   They're responsible for the remaining of that ticket. They have to be available.   If they're not available, if they're -- get a phone call and they don't answer, that's the grounds for dismissal.

Q   Now, when you say "available," is that time actually out on the site or is it time away from the site?

A   They could be away from the site.

Q   So even though they're not on the site, they're still responsible to that client?

A   Correct.

Q   And if a ticket is 18 hours, how long are they responsible to that client?

A   For 18 hours.

February 20, 2019 Trial Transcript, 27:6 – 28:11; 93:18 – 94:13 (emphasis added).   Plaintiff

Joshua Edwards gave consistent testimony in this regard:

> Q   In fact, on the well sites there's substantial down time?
>
> A   There is down time, yes.
>
> Q   Okay.  Out of a 24 hour day on a well site, how much of that do you think is -- would be stand time -- stand by time?
>
> A   It depends on who's doing what and what happens with the well, honestly.
>
> Q   Okay.  But it's possible to work four, five, six, seven straight days of 24 hours because you're not working a straight 24 hour period are you?
>
> A   Yes.
>
> . . .
>
> Q   And tell me what your understanding of on call time is?
>
> A   On call time means you -- *you're waiting*, you got a phone ready to go, or you're sitting there ready to go *waiting* on somebody else.
>
> Q   So you're still on the client's time, you're still on the company's time, correct?
>
> A   Correct.
>
> Q   You can't go to the movies and turn off your phone and have popcorn?
>
> A   No.
>
> Q   And if you did that you'd be fired?
>
> A   You should be, yes.

February 20, 2019 Trial Transcript, 214:10 – 19; 216:2 – 14 (emphasis added).  *See also*

February 20, 2019 Trial Transcript, 252:4 24; 253:13 – 23) (Garcia Testimony).

As to the occasional aberrations on tickets Plaintiffs contend were somehow reflective of

systemic FLSA violations, trial testimony reflected the aberrations at worst were "mistakes" or

even indicative of previously undetected dishonesty by employees.

Ms. Clark testified, for instance:

> Q   So that's four job tickets in a day where Steve Poff was there, each of those jobs there were eight hours per helper, correct?
>
> A   Correct.
>
> Q   So isn't it true then that what he did was got eight hours on his timesheet for each of the four jobs that day?
>
> A   That looks like that's what he did.
>
> Q   And that's with the normal practice and payment of the payroll of J4 at that time, was it not?
>
> A   No, it was not.
>
> Q   It wasn't?
>
> A   No, sir, it wasn't.
>
> Q   So that's just an aberration, some kind of a mistake?
>
> A   That's something that made it through, yes, sir.
>
> . . .
>
> Q   It wasn't unusual at J4 -- back in that time period, 2013 to 2015 -- for J4 to pay employees hours on their time sheet it's -- in excess of 24 hours a day, correct?
>
> A   There was a *few* that made it by.  But, in my opinion, these employees were *cheating us*.
>
> . . .
>
> Q   Now, we also see here that Mr. Poff has 32 hours?
>
> A   Correct.
>
> Q   Is it possible to work 24 hour -- more than 24 hours in a day?
>
> A   No, sir.

Q    Okay, is this the example of the cheating that you discussed earlier?

A   Yes, sir.

                              . . .

Q    What concerned you about [Plaintiff Banda's time record]?

A     Well, the time, for one thing.   It's impossible for anybody to work 44 and a half hours in a day.

Q   Did you take your concern to anyone?

A   Yes, sir.   I took it to one of the managers.

    At the time, I do recall him looking at it and -- because he came off of a frac job and then to a different job.   And they didn't have a way to verify it at the time, and he said, "Just let it go."

    And, you know, the way I took it, they were going to deal with it later.

Q   When you say "deal with it later," can you explain what you mean?

A    I mean by, talk to the employee about it, you know, why he wrote down excessive hours.

Q   And did you expect Banda to have another one and try this again?

A   No, I didn't.

February 20, 2019 Trial Transcript, 26:14 – 27:2; 82:14 – 19; 95:20 – 96:2 (emphasis added).

    Ms. Clark further testified aberrations of the kind were in any event decidedly rare:

Q   Okay, so over a two-year period, you're going to have, roughly – not roughly – you're going to have 730 individual daytime entries, correct?

A   Correct.

> Q    So 730 time entries for ten employees, that's seven thousand, three hundred and -- three hundred time entries, correct?
>
> A   Correct.
>
> Q   And we've seen, as we said, maybe 15, 20 examples of overpayments?
>
> A   Yes.

February 20, 2019 Trial Transcript, 105:17 – 106:2.

But perhaps of greatest significance, Defendants simply discredited that Plaintiffs were credible witnesses on this issue.  By way of example only, under cross examination, Joshua Edwards admitted:

> Q    And no matter how long I gave you with these documents, you're not going to be able to tell anyone whether you were written up or written down on a specific day, were you?
>
> A   No, sir.
>
> Q    And you have no way of accurately telling the Jury where the hours on your time sheets are correct, whether they should have been higher or whether they should have been lower, can you?
>
> A   We have our ticket hours that we were given and that was the hours that we put on our time sheets so that we charge our time to.
>
> Q    Mr. Edwards, my question was you have no way of accurately telling the Jury whether the hours on your time sheet are correct, whether they should be higher or lower, can you?
>
> A   Correct.

February 20, 2019 Trial Transcript, 209:18 – 210:7.  Under cross examination, Armando Garcia also admitted:

> Q   And Mr. Garcia, sitting here today, you don't know whether J4 owes you any money, do you?

16

> A  I do not.
>
> Q    You have no firsthand knowledge that you're owed anything, correct?
>
> A  I do not.

February 20, 2019 Trial Transcript, 241:13 – 18.  *See also* February 20, 2019 Trial Transcript, 320:21 – 320:7 (Humberto Morales testimony).

Indeed, Mr. Edwards even proved that on rare occasions records may have seemed abnormal at a superficial level, but in substance there were innocent explanations that undercut Plaintiffs' theory of the case, e.g.:

> Q  Well sometimes you would start a day and you would work, let's say, 27 hours, and you would just bill all that time in one day, right?
>
> A  Correct.
>
> Q    Okay.  So you didn't make the technical correct description of moving 24 hours in one day and then moving three 24 hours into the next, you just billed the 27 into one day?
>
> A  Yes.

February 20, 2019 Trial Transcript, 213:18 – 25.  Whichever party had the burden of proof with respect to the sufficiency of time records and payment, *cf*. (Doc. 324, Page 17 of 26), the foregoing evidence was more than sufficient for the jury to conclude employees were not routinely, intentionally, or because of any fault attributable to 4JLJ improperly paid.

### iii.    *Record Evidence 4JLJ was the "Employer" (not Mr. Jalufka)*

Plaintiffs additionally contended Mr. Jalufka, in his individual capacity, should be deemed the statutory "employer" pursuant to the FLSA.  *See* (Doc. 324, Pages 8 of 26 – 9 of 26). As an initial matter, Plaintiffs did not move for a judgment as matter of law on this ground before the case was submitted to the jury.  *Cf*.  February 21, 2019 trial transcript, 266:14 – 267:3;

February 25, 2019 trial transcript, 79:7 – 80:3.  This issue consequently has been waived.  *See* pp. 6 – 7 *supra*.

Defendants in any event elicited testimony Mr. Jalufka did *not* exercise "operational control" over 4JLJ by either exercising power to hire, fire, supervise, schedule, set pay, or otherwise control 4JLJ in any manner that could have subjected him to direct FLSA liability. For instance, Ms. Clark testified as follows:

> Q    Does John Jalufka make the day-to-day hiring decisions?
>
> A No, sir.
>
> . . .
>
> Q  Mr. Jalufka, is he the person who handles the day-to-day firing?
>
> A   No, sir.
>
> Q   Does he handle the day-to-day scheduling?
>
> A   No, sir.
>
> . . .
>
> Q   Mr. Jalufka, is he the person who handles the day-to-day firing?
>
> A   No, sir.
>
> Q   Does he handle the day-to-day scheduling?
>
> A   No, sir.
>
> . . .
>
> Q    And is Mr. Jalufka the one that sets the individual operator's and employee's pay?
>
> A   No, sir.
>
> . . .

Q    And who maintains the employment files and documents at 4 the company?

A  I do.

Q  Not Mr. Jalufka?

A  Not Mr. Jalufka.

. . .

Q  Okay, and can you tell me about the different spectrums of the type of owners that run a company?

A    Well, there's – there's an owner that controls everything; then there's owners that rely on others.

Q  Okay, and when you say "controls everything," what do you mean?

A  I mean hiring, firing, payables, receivables -- you know, everything.

Q  Is Mr. Jalufka that type of owner?

A  No, sir.

. . .

Q    Based on your 34 -- 32 years of experience at the company, is Mr. Jalufka the one that's making those day-to-day decisions?

A  No, he's not.

February 20, 2019 Trial Transcript, 87:3 – 4; 87:14 – 18; 87:23 – 25; 88:3 – 7; 88:18 – 89:2; 89:6 – 9.

Plaintiff Joshua Edwards indeed admitted:

Q  [Mr. Jalufka]  didn't hire you, right?

A  No.

Q  He didn't set your schedule, right?

A  No.

> Q   He didn't set your pay, right?
>
> A   No.
>
> Q   And as you testified he didn't fire you, and you're not aware of anyone that he did fire?
>
> A   No, he did not fire me.
>
> Q   And you're not aware of anyone that he didn't -- that he did fire?
>
> A   No.

February 20, 2019 Trial Transcript, 175:14 – 25.  *See also* February 20, 2019 Trial Transcript, 303:6 – 17 (Humberto Morales testimony).[3]

### iv.   Record Evidence of the TCA Exception

Although the jury never reached the issue to warrant Plaintiffs' evidentiary sufficiency contention in the abstract—Defendants in any event propounded evidence that Plaintiffs' contentions regarding the operation of vehicles with a gross vehicle weight less than 10,000 pounds simply was not credible.  *Cf.* (Doc. 324, Pages 9 of 26).  The jury consequently would have had (had it been necessary) evidentiary basis to rule in 4JLJ's favor regarding the "TCPA exemption."

Joshua Edwards, by way of example, proved he lacked credibility based on exchanges such as the following:

> Q   . . . .   In that answer you changed it to *we*.  And that wasn't the question, correct?   My question was how much did *you* drive, and the question earlier was how much did *you* drive the van.  And you testified earlier that *you* drove it every week and that's not accurate, is it?

---

[3] Here as well, the strength of the evidentiary record is so significant Defendants need not principally rely upon Mr. Jalufka's testimony.  Defendants nonetheless note Mr. Jalufka testified to facts that demonstrated he was not the statutory "employer."  *See* February 21, 2019 Trial Transcript, 193:24 – 194:7.

A   It is accurate.  *We* did drive the vans every week.

Q   Mr. Edwards, I'm not asking you about *we*.  I'm asking you about *you*.  And as you saw your testimony was, "*I* did not drive the vehicles every week," right?

A   Yes.

February 20, 2019 Trial Transcript, 190:2 – 11 (emphasis added).

Defendants moreover elicited evidence that *factually*, there simply was no credible evidence by which the jury should have found vehicles weighing less than 10,000 were used to fulfill uncompensated job requirements.  In that regard, Mr. Edwards testified:

Q   And you don't have your own personal vehicle there, right?

A   Correct.

Q   And you don't drive the large vehicles around town to run errands, do you?

A   No, sir.

Q   Okay.  So any personal errand that has to be run on a crew is going to be run using either the vans or a small truck, right?

A   That is correct.

Q   Okay.  And you've got, as you said on a large job, to 20 employees who are all running their personal errands in small trucks and vans, correct?

A   Yes, sir.

. . .

Q   And you said there were two vans that would come out to a well site?

A   Yes.

Q   Okay.  And so that means you've got two individuals that are driving a van, correct?

> A   Correct.
>
> Q   And the vast majority, if it's two vans, roughly 12 or 14 guys who chose not to drive a van, correct?
>
> A   Correct.
>
> Q   And you don't know of anyone that was fired or punished or disciplined because they didn't drive a van, correct?
>
> A   I don't recall at this time.
>
> Q   You know it wasn't a requirement, right?
>
> A   It might have been a requirement.  It might not have been.  We all needed to get back and forth. So, I don't know if it was or wasn't a requirement.

February 20, 2019 Trial Transcript, 191:15 – 192:3.

Mr. Garcia otherwise testified:

> Q   And when you add the truck, the small vehicle, plus the trailer and any of the materials on it, it would be over 10,001 pounds, correct?
>
> A   Yes.

February 20, 2019 Trial Transcript, 274:6 – 9.

The foregoing evidence regarding the discretionary bonuses, accuracy of compensation, Mr. Jalufka's status, and the TCA exception (in many cases originating from Plaintiffs' own witnesses), establishes there *at worst* was evidence of record whereby the jury either could have been persuaded by Plaintiffs, or been persuaded by Defendants.  The jury was persuaded by Defendants.  As matter of law, Plaintiffs are not entitled to relief from that outcome.

### C.   Plaintiffs' Contention regarding "Counsel's Argument" is not a Basis for Relief

Given the above-discussed record evidence undercutting *each* of the grounds for relief upon which Plaintiffs premise their Motion, there is no basis to infer the jury relied upon what

Plaintiffs suggest (without elaboration or proper briefing) was improper counsel argument. *Cf.* (Doc. 324, Page 1 of 26). Plaintiffs, as an initial matter, failed to object to *any* of the argument at trial. On that basis alone their untimely contention is waived and not properly before this Court. *Cf. Baisden v. I'm Ready Prods.*, 693 F.3d 491, 509 (5th Cir. 2012) ("Although [Plaintiff] alleges prejudice [from the arguments by counsel] now, he raised *no objection* to the statements at trial. [Plaintiff] has thus waived his objection to these statements, and this court need not consider them.") (emphasis added); *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 5th Cir. 1988) ("[Plaintiff] failed to object to [the arguments by defense counsel] either at the time of the argument or at a sidebar conference immediately thereafter. . . .   [Plaintiff] is now barred 'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict.'").

But apart from the waiver, there is absolutely no basis given the strength of the above-discussed evidentiary record to infer argument improperly influenced the outcome, because the evidence discussed above was legally sufficient without regard to any indiscernible effect of the argument. *Cf.* 848 F.2d at 620  (holding a new trial premised on challenged jury argument is carefully scrutinized "because of [the Fifth Circuit's] respect for the jury as an institution and our concern that the party who persuaded the jury should not be stripped unfairly of a favorable decision. . . .'").

## III.    CONCLUSION

WHEREFORE, Defendants 4JLJ, LLC d/b/a J4 Oilfield Services and John Jalufka respectfully request this Court deny Plaintiffs' *Renewed Motion for Judgment as a Matter of Law, or in the Alternative Motion for New Trial*, grant Defendants' separately filed Motion for Entry of Judgment, and grant Defendants all other relief to which they may be entitled.

Respectfully Submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Daniel D. Pipitone*
    Daniel D. Pipitone[*]
    Texas Bar No. 16024600
    700 Milam Street, Suite 2700
    Houston, Texas 77002
    Tel:  713-222-4060
    Fax:  713-222-5813
    dpipitone@munsch.com

**ATTORNEY FOR DEFENDANTS**

**OF COUNSEL:**

| | |
|---|---|
| **Munsch Hart Kopf & Harr, P.C.**<br>700 Milam Street, Suite 2700<br>Houston, Texas 77002<br><br>**Michael A. Harvey**<br>Texas Bar No. 24058352<br>SD Texas Bar No. 917759<br>700 Milam Street, Suite 2700<br>Houston, Texas 77002<br>Tel: (713) 222-4015<br>Fax: (713) 222-5835<br>mharvey@munsch.com | **Munsch Hart Kopf & Harr, P.C.**<br>3800 Lincoln Plaza<br>500 North Akard<br>Dallas, Texas 75201<br><br>**Nolan C. Knight**<br>Texas Bar No. 24027125<br>SD Texas Bar No. 875454<br>3800 Lincoln Plaza<br>500 North Akard<br>Dallas, Texas 75201<br>Tel: (214) 855-7500<br>Fax: (214) 855-7584<br>nknight@munsch.com |

---

[*] Attorney in Charge

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record by means of ECF this 19 day of March 2019:

James Moulton
MOULTON & PRICE, P.C.
109 SH 110 South
Whitehouse, Texas 75791
**ATTORNEY FOR PLAINTIFFS**

*/s/ Daniel D. Pipitone*